**IN THE SUPREME COURT OF THE STATE OF NEW MEXICO**

**Opinion Number: 2010-NMSC-005**

**Filing Date: January 19, 2010**

**Docket No. 29,992**

**STATE OF NEW MEXICO**,

      **Plaintiff-Appellee,**

**v.**

**WILLIAM RILEY**,

      **Defendant-Appellant.**

**APPEAL FROM THE DISTRICT COURT OF CURRY COUNTY**
**Joe Parker, District Judge**

Hugh W. Dangler, Chief Public Defender
William A. O'Connell, Assistant Appellate Defender
Santa Fe, NM

for Appellant

Gary K. King, Attorney General
Nicole Beder, Assistant Attorney General
Santa Fe, NM

for Appellee

**OPINION**

**SERNA, Justice.**

**{1}** Pursuant to Rule 12-102(A)(1) NMRA, William Riley (Defendant) is before this Court on direct appeal from his convictions for first degree murder, aggravated assault with a deadly weapon, tampering with evidence, and shooting at or from a motor vehicle. He argues that the evidence presented at trial was insufficient to support his conviction for first degree murder. Defendant also makes the following arguments: (1) the district court abused its discretion when it denied his motion to strike the jury pool; (2) he was prevented from fully cross-examining an accuser against him; (3) the convictions for both first degree murder and shooting at or from a motor vehicle constituted

1

double jeopardy; and (4) portions of his sentence were unconstitutionally enhanced under NMSA 1978, Section 31-18-15.1 (1979) (amended 1993). We affirm Defendant's convictions and affirm the district court's denial of Defendant's motions for a new trial. We agree that portions of Defendant's sentence were unconstitutionally enhanced and remand to the district court with instructions to vacate the aggravated portions of his sentence.

## I.  BACKGROUND

{2}     On June 25, 2004, Defendant shot his friend, Shawn Pitts (Victim) multiple times while Victim was inside a car in Defendant's driveway. Victim later died from his wounds. Defendant and Erica Moten had been in a relationship for five to six years and had two children together. They lived in a house together in Clovis until Moten ended the relationship about one and a half months prior to the murder. After the relationship ended, Defendant moved into his own apartment and made attempts to reconcile with Moten. Two or three weeks before the murder, Moten began to date Victim. Moten and Victim kept their relationship a secret because Victim did not want to ruin his friendship with Defendant. Victim was also dating Moten's close friend, Ray Shaun Parsons, who Moten considered to be her sister and who had the same grandmother, Anne Parsons (Grandmother).


{3}     About three weeks before the murder, Defendant had a lengthy conversation with Grandmother about his relationship with Moten and how he wanted to reconcile with her so that he, Moten, and their children could be a family again. Grandmother was aware that Moten and Victim were "seeing" each other, but she did not inform Defendant because she was concerned how Defendant would react if he knew. She testified that "hell might break loose" if Defendant caught the two of them together. Defendant informed Grandmother that Parsons was "messing around" with Victim and that he was concerned that Victim was mistreating her. Grandmother testified that Defendant was depressed because he was not able to reconcile with Moten and maintain his family. Grandmother characterized the relationship between Defendant and Moten as obsessive and encouraged Defendant to get counseling. Grandmother also encouraged Defendant to move back to his family in California for a while so that he could reflect on what went wrong with his relationship and to think about his daughters. Defendant moved back to California.

{4}     While in California, Defendant made a phone call to Grandmother's house in an attempt to contact Moten and spoke with Grandmother. Defendant informed Grandmother that he was returning to Clovis and told her, "I didn't take care of things before I left there and I've just got to come back and I'll just get everything done I need to do and then I'm going to just go on back to California and maybe things will work out for us later." A day or two before the murder, Defendant called Moten from a bus stop in Arizona and told her that he was returning to Clovis. Then the night before the murder, Defendant broke into Moten's house and wrote her a letter, dated Thursday, 11:00 p.m. to 3:00 a.m., and left it for her in the house. In the letter, Defendant expressed his desire to reconcile with Moten and to have a family and stated, "You [are] the world in my life, I want to be back in your arms, I want to love you and my God given children, you guys are my [oxygen] with out you I [can't] breath[e]." Defendant also stated in the letter,

2

But I came back to Clovis and I had to flat out dis [that] bitch, I [don't] want my sister in law to be acting like that [though] because she is a smart and decent girl and if a bitch even get out of line with her (Shawn) I might snap and [lose] it!!!"

{5}     The following day, Victim's friend, Chris Aultman, drove Victim from Parsons' house to the daycare at which Parsons and Moten worked to retrieve keys to Parsons' home. Aultman remained in the car while Victim retrieved the keys and looked up to see Defendant and Victim talking in front of the daycare. Defendant and Victim began to argue about Moten. Defendant told Victim, "Let's go talk at my house." The two then started walking towards Defendant's apartment, with Aultman driving along beside them. When the three men reached Defendant's apartment, Defendant and Victim continued arguing and were "in each other's face," and Aultman exited his car and attempted to separate them. After they were separated, Defendant called Victim a "bitch" and Victim called Defendant a "coward." At that point, Aultman and Victim got into the car and Defendant went into his apartment. About five to ten seconds later, Defendant ran out of his apartment with a gun in his hand, yelling, "I'll kill you. I'll kill you" and began shooting at the car. Aultman had seen the gun that Defendant wielded in Defendant's possession prior to the murder. In all, Defendant fired at Victim five or six times. As Defendant was shooting, Aultman saw Victim's chest bleeding. Aultman got out of the car and began to run away, and Defendant ran towards the daycare with the gun in his hand. Defendant ran down an alley, jumped the fence to the daycare and went inside the building. Once inside, Defendant took off his shirt and threw it behind a refrigerator. Defendant then left the daycare and proceeded to run up the road in a frantic manner where he was eventually detained by police. Meanwhile, back at Defendant's apartment, Aultman returned to the car to check on Victim. When Aultman got into the car, Victim grabbed his arm and said, "I can't believe he shot me." Aultman then drove Victim to the hospital where Victim later died.

{6}     Police found a black .45 caliber revolver underneath a workbench in the backyard of the daycare, which was later identified as the gun Defendant used in the shooting. Police also recovered .45 caliber bullets from Defendant's drawer in his apartment. Five bullets were accounted for in the crime scene investigation, although only four were recovered, which was consistent with the number of casings found in the revolver. A firearm and ballistics expert concluded that the five cartridges and the four bullets were all fired from the same gun.

{7}     Police recovered Defendant's shirt from behind chairs or boxes that were next to a refrigerator in the daycare. Police collected clothing and DNA samples from Defendant. Upon examination, the shirt collected from Defendant as well as his left hand appeared to contain blood stains. Also, one of the T-shirts tested contained the DNA of both Defendant and Victim. Police conducted a gunshot residue test of Defendant and while the test was being conducted, Defendant stated that he had shot a firearm a couple of days before. Also, Defendant's shoe and a shoe print found at the daycare were consistent in terms of physical shape, size, and tread design.

{8}     After conducting a crime scene recreation, a crime unit investigator concluded that Victim was shot while in the passenger seat of the car. Based on the evidence found at the scene, the investigator concluded that Victim was initially in the passenger seat, then he started to turn towards the driver side of the car, exited the car from the driver side, ran away from the car, and then

3

returned to the car before being driven to the hospital. The investigator also opined as to the sequence of the shots: the first shot struck the hood of the car and was shot from the entrance of Defendant's apartment, which was about 38 feet away; the second shot struck and shattered the window on the passenger side of the car; the third shot most likely struck Victim, traveled through his clothing, and struck the steering column; the fourth shot struck Victim in the upper torso; and the fifth shot struck Victim in the buttocks.

**{9}** An autopsy of Victim's body revealed Victim sustained three gunshot wounds: on the left shoulder, on the left chest area, and on the right buttocks. The medical investigator concluded that the second shot—which struck and broke Victim's breastbone, traveled through the right or left lung, and exited from the right side of Victim's body—was a fatal wound. The medical investigator was able to determine that the distance between the barrel of the gun and Victim's body was within two to three inches of Victim's body for the left shoulder wound, within three to four inches for the chest wound, and within a foot and a half for the buttocks wound. A combination of gunshot wounds was the cause of Victim's death.

**{10}** Defendant was charged with first degree murder, aggravated assault with a deadly weapon, tampering with evidence, and shooting at or from a motor vehicle.[1] A jury found Defendant guilty on all charges and Defendant appealed to this Court.

## II.    DISCUSSION

### A.    Sufficiency of the Evidence

**{11}** Defendant argues that there was insufficient evidence of deliberate murder to support his first degree murder conviction. We disagree.

**{12}** "The test for sufficiency of the evidence is whether substantial evidence of either a direct or circumstantial nature exists to support a verdict of guilty beyond a reasonable doubt with respect to every element essential to a conviction." *State v. Duran*, 2006-NMSC-035, ¶ 5, 140 N.M. 94, 140 P.3d 515 (internal quotation marks and citation omitted). In applying this standard, an appellate court "review[s] the evidence in the light most favorable to the guilty verdict, indulging all reasonable inferences and resolving all conflicts in the evidence in favor of the verdict." *State v. Rudolfo*, 2008-NMSC-036, ¶ 29, 144 N.M. 305, 187 P.3d 170 (internal quotation marks and citation omitted). In reviewing the evidence, the relevant question is whether "*any* rational jury could have found each element of the crime to be established beyond a reasonable doubt." *State v. Garcia*, 114 N.M. 269, 274, 837 P.2d 862, 867 (1992). The reviewing court does not substitute its judgment for that of the jury: "[c]ontrary evidence supporting acquittal does not provide a basis for reversal

---

[1]Defendant was also charged with possession of a firearm, possession of marijuana with intent to distribute, possession of drug paraphernalia, and child abuse. Defendant made a motion to sever these charges from the other four charges. The district court granted the motion to sever and the State later dismissed the severed charges.

4

because the jury is free to reject [the d]efendant's version of the facts." *State v. Rojo*, 1999-NMSC-001, ¶ 19, 126 N.M. 438, 971 P.2d 829. Nor will this Court "evaluate the evidence to determine whether some hypothesis could be designed which is consistent with a finding of innocence." *State v. Graham*, 2005-NMSC-004, ¶ 13, 137 N.M. 197, 109 P.3d 285 (internal quotation marks and citation omitted).

{13}   In New Mexico, first degree murder includes "any kind of willful, deliberate and premeditated killing[.]" NMSA 1978, § 30-2-1(A)(1) (1963) (amended 1994). A deliberate decision is one "arrived at or determined upon as a result of careful thought and the weighing of the consideration for and against the proposed course of action." UJI 14-201 NMRA. "Intent is subjective and is almost always inferred from other facts in the case, as it is rarely established by direct evidence." *State v. Sosa*, 2000-NMSC-036, ¶ 9, 129 N.M. 767, 14 P.3d 32 (internal quotation marks and citation omitted).

{14}   The State presented substantial evidence to support the jury's conclusion that Defendant killed Victim with deliberate intent. There was background evidence of Defendant's state of mind prior to the day of the murder. Defendant was upset and depressed after Moten ended their six-year relationship and made futile attempts to reconcile with Moten. Grandmother testified that the relationship between Defendant and Moten was "obsessive," that she had encouraged Defendant to get counseling and that "hell might break loose" if Defendant discovered that Moten and Victim were "seeing" each other. While in California, Defendant made a phone call to Grandmother and told her that he was returning to Clovis because he "didn't take care of things" before he had left and how he will "just get everything done." The night before the murder, Defendant broke into Moten's house and left her a letter that stated his desire to reconcile with her and to maintain his family. He wrote that Moten was "the world in [his] life" and that he could not breathe without her and their two children. He expressed his concerns about Victim "messing around" with Parsons and wrote that he would "snap and [lose] it" if Victim "[got] out of line" with her. On the day of the murder, Defendant confronted Victim at the daycare and the two began arguing loudly about Moten until Defendant told Victim that they should "go talk at [his] house." The two continued arguing, and at one point, they were "in each other's face." When they separated, Defendant called Victim a "bitch" and Victim called Defendant a "coward." Defendant then went into his apartment and five to ten seconds later, came out running towards Victim and Aultman with a gun in his hand. Defendant yelled, "I'll kill you. I'll kill you" as he shot at Victim five or six times. Additionally, the jury was presented with physical evidence from which it could have inferred deliberate intent. There was evidence that Victim was shot two times at point-blank range while he was in the passenger seat of the car and was once again shot in his buttocks as he was attempting to flee from the car.

{15}   Relying on *State v. Taylor*, 2000-NMCA-072, 129 N.M. 376, 8 P.3d 863 and *Garcia*, 114 N.M. 269, 837 P.2d 862, Defendant asserts that the evidence was insufficient to support a conviction of first degree murder. In claiming that his actions were "no different than those in *Taylor* and *Garca* [sic]," Defendant contends that "[t]here was no evidence to sustain a finding that [Defendant] weighed the considerations for and against his proposed course of action; and that he weighed and considered the question of killing and his reasons for and against his choice." We disagree.

5

**{16}** In *Taylor*, the Court of Appeals reversed a first degree murder conviction because there was insufficient evidence of Defendant's deliberation. 2000-NMCA-072, ¶¶ 24, 26. In that case, while the defendant and his wife were at home, the wife slapped their eighteen-month-old daughter in the face. *Id.* ¶ 4. After the wife hit the baby the third time, the defendant retrieved a gun and shot his wife three times. *Id.* ¶ 5. Defendant told the police that his wife "had the devil in her eyes" when she was slapping the baby and that he shot "the devil." *Id.* After a competency hearing pursuant to NMSA 1978, Section 31-9-1.5 (1988) (amended 1999), the district court found that there was "clear and convincing evidence that [the d]efendant committed first degree murder." *Id.* ¶ 7.

**{17}** The Court of Appeals reversed, stating that "the events surrounding the shooting are vague . . . . [and] our knowledge of the circumstances is limited." *Id.* ¶¶ 20, 26. The Court held that the judicial findings—the defendant's confusion between his wife and the devil, the fact that he wandered through the desert looking for his wife after he had already shot her, and the defendant's statements that his daughter was with his wife and with God—"put into question [the d]efendant's state of mind at the time of the shooting, and they raise grave doubts about whether [the d]efendant's killing of [his wife] was the result of careful thought." *Id.* ¶ 21 (internal quotation marks, brackets, and citation omitted). The Court held that the "strongest evidence supporting the district court's finding of first degree murder"—the defendant's admission that he armed himself with a gun and shot his wife after she had slapped their baby the third time—was insufficient for a finding of deliberate murder. *Id.* ¶¶ 22, 26. The Court reasoned that

> [a]lthough the retrieval of weapon could have given [the] [d]efendant the opportunity to deliberate about killing [his wife], there is no evidence from which we can permissibly infer that [the] [d]efendant actually did so. We have no statements before the shooting that he wanted to kill [his wife] or wished her dead.

*Id.* ¶ 22. The Court held that there was no evidence of a "carefully crafted plan to kill, or of [the d]efendant's hot pursuit of the victim, or a manner of death requiring an extended time to complete, such as strangling and suffocating the victim," *id.* (internal citations omitted), and reversed the district court's finding of first degree murder, *id.* ¶ 26.

**{18}** In *Garcia*, this Court also reversed a conviction for first degree murder because there was insufficient evidence to support a finding of deliberate intent. 114 N.M. at 275-76, 837 P.2d at 868-69. In that case, the defendant and the victim began arguing, subsequently made up, then began fighting again until ultimately the defendant stabbed the victim. *Id.* at 270, 837 P.2d at 863. We concluded that

> [t]here was *no* evidence to support the jury's conclusion that . . . [the defendant] decided to stab [the victim] as a result of careful thought; that he weighed the considerations for and against his proposed course of action; and that he weighed and considered the question of killing and his reasons for and against this choice.

*Id.* at 274, 837 P.2d at 867. We held that the defendant's conduct was "consistent with a rash and impulsive killing," *id.* at 275, 837 P.2d at 868, and thus reversed the first degree murder conviction,

*id.* at 276, 837 P.2d at 869.

{19}  The instant case is distinguishable from *Taylor* and *Garcia*. In both *Taylor* and *Garcia*, there was no evidence of the defendants' state of mind prior to the respective killings. Here, the State presented evidence of Defendant's emotional state regarding the recent break up in the weeks prior to the murder as established by Defendant's conversations with Grandmother, the letter he wrote to Moten, and the fact that he and Victim were arguing about Moten in the moments leading up to the killing. Defendant also expressed his attitude toward Victim in a threatening tone when he wrote the letter to Moten.

{20}  Additionally, the nature of the killing in this case further distinguishes it from *Taylor* and *Garcia*. The manner in which Defendant continued to shoot Victim differed significantly from the way the *Taylor* and *Garcia* defendants killed their respective victims. While the *Taylor* defendant's retrieval of a gun and subsequent shooting of his wife after seeing her slap their daughter for the third time and the *Garcia* defendant's fatal stabbing which came in the midst of a period of fighting and making up were insufficient to prove deliberate intent, a reasonable jury could infer deliberate intent based on Defendant's actions in this case. Defendant came running out of his apartment yelling, "I'll kill you. I'll kill you[,]" as he began to shoot at Victim. He first shot from about thirty-eight feet away and then ran towards Victim and fired four or five more shots. Defendant fired two of the shots from less than four inches from Victim's body and then shot Victim one final time as Victim was attempting to escape from the car. *See State v. Garcia*, 95 N.M. 260, 261-62, 620 P.2d 1285, 1286-87 (1980) (finding of deliberate intent when defendant was aggressor and victim had tried to run away before fatal shot).

{21}  The evidence of Defendant's state of mind in the days leading up to the murder and his declaration of his intent to kill Victim just before opening fire, coupled with the physical evidence is sufficient to prove Defendant's deliberate intent to kill. Viewing the evidence in the light most favorable to the verdict, we hold that a reasonable jury could have concluded that Defendant killed Victim with deliberate intent. Defendant's first degree murder conviction is affirmed.

## B.  Motion to Strike the Jury Pool

{22}  On appeal, Defendant argues that he was denied his Sixth and Fourteenth Amendment rights to have a petit jury selected from a fair cross-section of the community. The State contends that Defendant failed to preserve the constitutional issue for appeal because his objection in district court was "legally insufficient." We agree with the State.

{23}  During the jury selection process, Defendant moved to strike the entire jury panel because he claimed that since Defendant was black, "under *Batson* [*v. Kentucky*, 476 U.S. 79 (1986)]," he was entitled to "a jury panel that at least has some blacks." Defendant moved for a mistrial, requested that the entire jury panel be struck, and that the State be given six months to ensure that a "proper" jury was empaneled. In the alternative, Defendant sought an interlocutory appeal so that the court could determine "whether a panel without any blacks should hear [the] case." The court denied Defendant's motions. After trial, during the sentencing proceeding, Defendant orally moved

for a new trial because there were "no blacks or no African Americans on the jury[]" and asked the court to take judicial notice of a 2000 federal census study which revealed that about ten percent of Curry County's population was black. The court denied the motion and proceeded with the sentencing.

**{24}** "To preserve a question for review it must appear that a ruling or decision by the district court was fairly invoked[.]" Rule 12-216(A) NMRA. Because the purpose of an objection is to invoke a ruling of the court upon a question or issue, an objection must be made with "sufficient specificity to alert the mind of the trial court to the claimed error," *State v. Lopez,* 84 N.M. 805, 809, 508 P.2d 1292, 1296 (1973), and it must be made timely. *State v. Gonzales*, 112 N.M. 544, 550, 817 P.2d 1186, 1192 (1991) ("review by an appellate court must be predicated upon a timely objection by a defendant").

**{25}** Defendant's objections regarding the jury pool were insufficient in terms of specificity and timeliness. Defendant's initial objection during the jury selection process, on the basis that he was entitled to "a jury panel that would have at least some blacks," did not amount to the constitutional challenge that he now asserts on appeal. *See United States v. Grose*, 525 F.2d 1115, 1119 (7th Cir. 1975) ("The mere observation that a particular group is underrepresented on a particular panel does not support a constitutional challenge."). On the other hand, while Defendant's post-trial objection contained slightly more specificity regarding a fair cross-section argument, it was untimely because at that juncture, the district court could not have remedied the situation. *See State v. Montoya*, 80 N.M. 64, 67, 451 P.2d 557, 560 (1968) ("The burden is on the appellant to make his objection known to the court at the earliest time in order to afford the court the opportunity to rule on the matter before allowing the argument to continue."). Thus, Defendant failed to preserve his claim that he was denied his right to a fair and impartial jury under the Sixth and Fourteenth Amendments.

## C.   Cross-Examination of Aultman

**{26}** Defendant argues that the trial court abused its discretion when it granted the State's motion in limine regarding an incident involving witness Aultman. He also claims for the first time on appeal that the court's decision deprived him of his right to fully cross-examine an accuser against him under the Sixth Amendment. However, since the issue of denial of the right to confrontation may not be raised for the first time on appeal, *State v. Torres*, 2005-NMCA-070, ¶ 20, 137 N.M. 607, 113 P.3d 877, we will not address the Sixth Amendment issue, but only the district court's grant of the State's motion in limine on an evidentiary basis. *See State v. Lucero*, 104 N.M. 587, 591, 725 P.2d 266, 270 (Ct. App. 1986) (holding that the defendant's hearsay objection "was not sufficiently specific to alert the trial court to the claimed constitutional error[,]" a violation of his confrontation clause rights).

**{27}** On June 7, 2004, two and a half weeks prior to Victim's murder, Aultman was in his car with his friend, George Allison, when Allison allegedly exited the car and threatened three people with a gun. Aultman and Allison were subsequently detained and a loaded .22 caliber revolver was recovered from the vehicle. Aultman told police that the gun belonged to his girlfriend. Due to a lack of participation by the alleged victims, no charges were filed against either Aultman or Allison.

8

The State filed a motion in limine, requesting that the court preclude Defendant from soliciting any testimony in reference to the June 7 incident on the basis that the incident is "more prejudicial than probative." The court granted the State's motion on that basis.

**{28}** "With respect to the admission or exclusion of evidence, we generally apply an abuse of discretion standard where the application of an evidentiary rule involves an exercise of discretion or judgment . . . ." *Dewitt v. Rent-A-Center, Inc.*, 2009-NMSC-032, ¶ 13, 146 N.M. 453, 212 P.3d 341. A trial court abuses its discretion when its "ruling is clearly against the logic and effect of the facts and circumstances of the case." *State v. Simonson*, 100 N.M. 297, 301, 669 P.2d 1092, 1096 (1983). Rule 11-403 NMRA provides in part that "evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice . . . ." "This rule gives the trial court a great deal of discretion in admitting or excluding evidence . . . ." *Behrmann v. Phototron Corp.*, 110 N.M. 323, 327, 795 P.2d 1015, 1019 (1990).

**{29}** Defendant argued that the June 7 incident established that Aultman had a weapon before the murder and that this fact "left open the possibility that . . . Aultman had inflicted the fatal shots." He also argued that the court's decision to prohibit any testimony regarding the June 7 incident did not allow him to "develop additional evidence that . . . Aultman was the slayer."

**{30}** Regarding the probative value of the June 7 incident, any connection between the incident and Aultman's involvement in the Victim's murder is too attenuated. It was not Aultman that was suspected of assaulting people with a gun; he was merely in the same car as the alleged perpetrator. Additionally, the gun found in the car during the June 7 incident was a .22 caliber revolver, as opposed to a .45 caliber revolver used in the murder. The district court noted this attenuation when it asked Defendant's trial counsel, "[D]oesn't it seem pretty remote that we're talking about a passenger, not a defendant, not the driver, not the weapon's owner? Doesn't it seem we're pretty remote in that regard?" Regarding the prejudicial factor of the Rule 11-403 balancing test, the State argued that it is "real prejudicial to try and bring up the fact that a witness—not even the accused, but a witness was involved in an aggravated assault that he was not accused of." We agree with the State. Generally, any reference to an incident involving a person threatening people with a gun would be considered prejudicial. In this case, given that a gun was used to kill Victim, any mention of Aultman being involved in an assault that also involved a gun would have a higher prejudicial effect.

**{31}** The district court's ruling that "the prejudicial nature of the testimony outweighs the probative value . . . related to the . . . June 7th, 2004 incident[]" was not "clearly against the logic and effect of the facts and circumstances of the case," *Simonson*, 100 N.M. at 301, 669 P.2d at 1096, and therefore, it did not abuse its discretion when it excluded testimony regarding the June 7 incident.

## D. Double Jeopardy

**{32}** Defendant contends that his convictions for both shooting at a motor vehicle and first degree murder constitute a double jeopardy violation. Defendant did not raise this issue in district court.

However, it can be raised for the first time on appeal. *See State v. Lopez*, 2008-NMCA-002, ¶ 12, 143 N.M. 274, 175 P.3d 942; NMSA 1978, § 30-1-10 (1963) ("The defense of double jeopardy may not be waived and may be raised by the accused at any stage of a criminal prosecution, either before or after judgment.").

{33} Defendant acknowledges that this Court has already held that convictions for these two offenses do not constitute a double jeopardy violation but nonetheless asks this Court to reconsider those holdings. *See State v. Gonzales*, 113 N.M. 221, 225, 824 P.2d 1023, 1027 (1992) (holding that a conviction for first degree murder and shooting into an occupied vehicle did not constitute a double jeopardy violation because "the legislature intended for separate punishment for unitary conduct that violated both statutes"); *State v. Dominguez*, 2005-NMSC-001, ¶¶ 16, 21, 137 N.M. 1, 106 P.3d 563 (Bosson, C.J., Chávez, J., dissenting) (holding that convictions for (1) voluntary manslaughter and shooting at or from a motor vehicle and (2) aggravated battery and shooting at a motor vehicle did not constitute double jeopardy violations).

{34} We honor the principle of stare decisis and are reluctant to overturn precedent because it promotes stability of the law, fairness in assuring that like cases are treated similarly, and judicial economy. *State v. Martinez*, 2006-NMSC-007, ¶ 28, 139 N.M. 152, 130 P.3d 731. Before overturning precedent, a number of factors are considered:

> 1) whether the precedent is so unworkable as to be intolerable; 2) whether parties justifiably relied on the precedent so that reversing it would create an undue hardship; 3) whether the principles of law have developed to such an extent as to leave the old rule no more than a remnant of abandoned doctrine; and 4) whether the facts have changed in the interval from the old rule to reconsideration so as to have robbed the old rule of justification.

*State v. Pieri*, 2009-NMSC-019, ¶ 21, 146 N.M. 155, 207 P.3d 1132.

{35} Defendant does not offer, nor do we find, any reason to depart from our precedent regarding this issue. The rationale we employed in *Gonzales* and *Dominguez* is still as viable today as it was when those cases were decided. Defendant's convictions for first degree murder and shooting at or from a motor vehicle do not constitute a double jeopardy violation.

### E. Enhancements of Defendant's Sentence

{36} Defendant contends and the State concedes that portions of his sentence were unconstitutionally enhanced pursuant to Section 31-18-15.1, a statute that was held unconstitutional in *State v. Frawley*, 2007-NMSC-057, ¶¶ 25-32, 143 N.M. 7, 172 P.3d 144. We agree and remand to the district court with instructions to vacate the aggravated portions of Defendant's sentence.

### III. CONCLUSION

{37} The State presented sufficient evidence such that a reasonable jury could have concluded that

Defendant killed Victim with deliberate intent and thus his first degree murder conviction is affirmed. Defendant was not denied his right to a fair and impartial trial under the Sixth and Fourteenth Amendments when the district court denied Defendant's request for a new jury panel, and the district court did not abuse its discretion when it granted the State's motion in limine regarding the June 7 incident involving Aultman. Defendant's convictions for first degree murder and shooting at or from a motor vehicle do not constitute a double jeopardy violation. Portions of Defendant's sentence were unconstitutionally enhanced pursuant to Section 31-18-15.1. We affirm Defendant's convictions but remand to the district court with instructions to vacate the aggravated portions of his sentence.

**{38}   IT IS SO ORDERED**.

_____
**PATRICIO M. SERNA Justice**

**WE CONCUR:**

_____
**PETRA JIMENEZ MAES, Justice**

**EDWARD L. CHÁVEZ, Chief Justice (specially concurring)**

**RICHARD C. BOSSON, Justice (concurring in part and dissenting in part)**

**CHARLES W. DANIELS, Justice (specially concurring)**

**CHÁVEZ, Chief Justice, specially concurring.**

**{39}**   I concur in the majority opinion with the exception of Section II(D), which discusses double jeopardy. I concur in the result of Section II(D).

**{40}**   Regarding the double jeopardy analysis in Section II(D), I agree that stare decisis prevents this Court from overruling precedent where the parties have not specifically argued the issue. Majority Opinion ¶ 34. I agree that, before overturning precedent, the factors we have identified for so doing must first be satisfied. _Id._ Defendant does not make a case for us to overrule our precedent by applying the factors relevant to a stare decisis analysis. Defendant simply asks us to reconsider the holding in _State v. Dominguez_, 2005-NMSC-001, 137 N.M. 1, 106 P.3d 563. This unilluminating request lacks the disciplined approach we have required in numerous opinions on the subject of stare decisis. Defendant does not even advance an argument that stare decisis requires a different approach when constitutional rights are implicated.

**{41}**   Absent such arguments, we in essence raise the issue of overturning our precedent sua sponte. Doing so will in my opinion do more harm than good. _See State v. Worrall_, 1999 MT 55, ¶ 71, 976 P.2d 968 (Gray, J., concurring in part and dissenting in part) (disagreeing with the decision

to modify a number of cases which no party had requested to be modified, stating "[W]e must zealously guard against the inclination to become cavalier in ignoring the importance of *stare decisis* . . . once we start raising and resolving issues *sua sponte* which result in overruling controlling precedent, we will be unable to restrain ourselves . . . ."); *Ex parte Hanna Steel Corp.*, 905 So. 2d 805, 810 (Ala. 2004) (Lyons, J., concurring in the result) ("Without a specific request to overrule prior precedent . . . a court taking such action sua sponte cuts off an adverse party's right to have the court consider the important subordinate question-assuming the precedent was wrongly decided, whether stare decisis requires adherence to it.").

{42}     However, I cannot agree with the statement in paragraph 35 of the majority opinion that we do not find "any reason to depart from our precedent" regarding the double jeopardy analysis in *State v. Gonzales*, 113 N.M. 221, 225, 824 P.2d 1023, 1027 (1992) and *Dominguez.* To agree with this statement would be a signal that I have abandoned my concerns with our double jeopardy analysis in this area. I hesitate to abandon my concerns because I firmly believe that our precedent is not in line with United States Supreme Court precedent regarding double jeopardy. A defendant who kills a victim in a single homicidal act should only be prosecuted under the homicide statutes absent a clear declaration by the Legislature that it intended punishment under multiple statutes. The Legislature is quite capable of articulating when it intends multiple punishments to apply. The following are examples of the Legislature expressing its intent to punish unitary conduct under more than one statute. NMSA 1978, § 30-6A-3(G) (1984, amended 2007) ("The penalties provided for in this section shall be in addition to those set out in Section 30-9-11 NMSA 1978."); NMSA 1978, § 30-31-26(A) (1972) ("Any penalty imposed for violation of the Controlled Substances Act [§§ 30-31-1 to -28, 30-31-30 to -40 NMSA 1978] is in addition to any civil or administrative penalty or sanction otherwise provided by law."); NMSA 1978, § 30-45-6(A) (1989) ("Prosecution pursuant to the Computer Crimes Act [§§ 30-45-1 to -7 NMSA 1978] shall not prevent any prosecutions pursuant to any other provisions of the law where such conduct also constitutes a violation of that other provision."); NMSA 1978, § 30-52-1(D) (2008) ("Prosecution pursuant to this section shall not prevent prosecution pursuant to any other provision of the law when the conduct also constitutes a violation of that other provision.").

{43}     I have previously expressed my disagreement with the approach taken by this Court in *Gonzales*, and I will not elaborate further. *See Dominguez*, 2005-NMSC-001, ¶¶ 37-39 (Chávez, J., dissenting); *State v. Armendariz*, 2006-NMSC-036, ¶¶ 32-39, 140 N.M. 182, 141 P.3d 526 (Chávez, J., concurring in part and dissenting in part). I will not vote to overturn controlling precedent unless I am persuaded to do so after I have had the benefit of full briefing and argument on the relevant factors for overturning our precedent. Accordingly, I concur in the result of Section II(D).

_____
**EDWARD L. CHÁVEZ, Chief Justice**

**BOSSON, Justice (concurring in part and dissenting in part).**

{44}     I dissent from only the double jeopardy portion of the Opinion and concur wholeheartedly

12

in the rest. My views on double jeopardy have been previously stated in *State v. Dominguez*, 2005-NMSC-001, ¶¶ 28-36, 137 N.M. 1, 106 P.3d 563 (Bosson, C.J., Chávez, J., dissenting), as well as by Chief Justice Chávez in the same opinion, *Id.* ¶¶ 37-42, with which I concur.

**{45}** Our disagreement stems from what stare decisis effect, if any, we should continue to give the earlier opinion of this Court in *State v. Gonzales*, 113 N.M. 221, 824 P.2d 1023 (1992), as well as the majority opinion of this Court in *Dominguez* which relied on *Gonzales*. Disturbingly, counsel in the present appeal has not asked this Court to overrule or modify our precedent by applying the factors we traditionally employ in a stare decisis analysis. I think our double jeopardy jurisprudence would benefit from such introspection, but perhaps it would best be initiated by the parties themselves and not by this Court acting sua sponte. I look forward to renewing our discussion at some time in the near future, hopefully guided by thoughtful arguments and briefs of counsel addressing stare decisis.

_____

**RICHARD C. BOSSON, Justice**

**DANIELS, Justice (specially concurring).**

**{46}** I concur in the Opinion of the Court, but I also am troubled by concerns of both our double jeopardy and our stare decisis jurisprudence.

**{47}** Defendant shot into a motor vehicle and killed someone. He has been punished cumulatively for the first-degree murder of the person he killed and for the second-degree felony of causing great bodily harm (the death of the same person) by shooting into a motor vehicle. If the resulting double jeopardy issue were a matter of first impression for this Court, I would have no hesitation in concluding that the Legislature did not intend to punish a person cumulatively for both crimes, simply because a bullet penetrated a motor vehicle before killing its intended victim. This is particularly so where the offense of shooting into a motor vehicle has been statutorily enhanced from a fourth-degree to a second-degree felony by the additional essential element that the shooting resulted in great bodily harm.

**{48}** However, this is not a matter of first impression. It was squarely decided by this Court in *State v. Gonzales*, 113 N.M. 221, 824 P.2d 1023 (1992), and reaffirmed more recently, albeit by a divided Court, in *State v. Dominguez*, 2005-NMSC-001, 137 N.M. 1, 106 P.3d 563. If the only things that have changed since the decisions in *Gonzales* and *Dominguez* are the identities of the human beings occupying the seats on this Court, legitimate concerns of stare decisis come into sharp focus. If we are guided by the rule of law and not by personalities, a mere change in composition of the Court should not be the cause of changes in the meaning of rules of law, including particularly the definitive interpretation of legislative enactments.

**{49}** Stare decisis is not the only jurisprudential concern, however, that should be taken into account in rethinking older holdings that seem inappropriate at a later time. There are other considerations that quite legitimately cause us to reevaluate and occasionally change prior holdings,

13

as summarized in Paragraph 34 of our majority Opinion. But those considerations have not been developed in this case. At this time, I am not persuaded that a case has been made to us for overruling our precedents, and I therefore concur in the result reached in Justice Serna's Opinion.

_____
**CHARLES W. DANIELS, Justice**

**Topic Index for *State v. Riley*, No. 29,992**

**AE**        **APPEAL AND ERROR**
AE-PA    Preservation of Issues for Appeal

**CT**        **CONSTITUTIONAL LAW**
CT-DJ    Double Jeopardy
CT-RF    Right to Confrontation

**CL**        **CRIMINAL LAW**
CL-MU    Murder

**CA**        **CRIMINAL PROCEDURE**
CA-FT    Fair Trial
CA-ES    Enhancement of Sentence
CA-SN    Sentencing
CA-SE    Substantial or Sufficient Evidence

**JR**        **JURIES**
JR-JG    Juries, General
JR-JS    Jury Selection
JR-RT    Right to Trial by Jury