**Certiorari Denied, July 29, 2010, No. 32,467**

**IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO**

**Opinion Number: 2010-NMCA-079**

**Filing Date: June 25, 2010**

**Docket No. 28,371**

**STATE OF NEW MEXICO,**

  **Plaintiff-Appellee,**

**v.**

**CLARENCE BROWN,**

  **Defendant-Appellant.**

**APPEAL FROM THE DISTRICT COURT OF TORRANCE COUNTY**
**Matthew G. Reynolds, District Judge**

Gary K. King, Attorney General
Ann M. Harvey, Assistant Attorney General
Santa Fe, NM

for Appellee

Hugh W. Dangler, Chief Public Defender
Corey J. Thompson, Assistant Appellate Defender
Santa Fe, NM

for Appellant

## OPINION

**FRY, Chief Judge.**

**{1}** Defendant Clarence Brown appeals his convictions for the manufacture of methamphetamine, conspiracy to manufacture methamphetamine, and possession of a stolen vehicle, arguing that there was insufficient evidence to support his convictions and that the district court erroneously admitted evidence obtained during a warrantless search of his

1

home. For the following reasons, we affirm Defendant's convictions. We also conclude that exigent circumstances justified the warrantless search of Defendant's home.

**{2}**     The State filed a motion asking that our opinion in this case be made formal. We hereby grant the motion. The opinion filed on June 8, 2010, is hereby withdrawn, and this opinion is filed in its place.

## BACKGROUND

**{3}**     On May 11, 2006, Deputy Erwin Young of the Torrance County Sheriff's Department was dispatched to a home in McIntosh, New Mexico, in reference to a possible structure fire. Upon arriving at the address, Deputy Young saw the remains of a trash fire that had just been extinguished by the fire department as well as a fire-damaged white utility trailer. Deputy Young noticed that there were a number of gallon-sized bottles of acetone and Heat, a carburetor cleaner, in the burnt trash pile. The deputy also noticed a truck, partially covered with a tarp, that had numerous parts removed. A VIN check on the vehicle indicated that the truck had been stolen.

**{4}**     Deputy Young encountered a woman on the property, April Green, who stated that she was a friend of the homeowner, Rhonda, that she had thrown a cigarette on the trash pile, and that it had burst into flames. Following the discovery of the stolen vehicle, Deputy Young called for backup. Sergeant Heath White responded and, when he arrived at the house, he "kept smelling a strong odor of . . . chemicals coming from the house" that was "consistent with meth labs that [he] previously had been involved with." The smell was so strong that Sergeant White asked Deputy Young to move his vehicle away from the house. Sergeant White also spoke to Green, who was not forthcoming about what she was doing there or whether she lived on the property.

**{5}**     The officers then began to check the property for people and observed a man, who was later identified as Charles Garcia, hiding in a travel trailer and holding a dog's mouth shut so that it would not bark. After securing Garcia, Sergeant White noted that "[t]he danger" was "building up at that point" due to the chemicals that had recently been burned, Green's unwillingness to talk about what was happening, and the fact that Garcia was hiding in the travel trailer. After securing the travel trailer, the officers approached the residence on the property and heard someone inside walking. When Sergeant White knocked on the residence, he heard someone running to the other end of the house. After about fifteen minutes of commanding the occupant or occupants to exit the house, Sergeant White found that the back door was unlocked and entered the home. The officers immediately encountered Genevieve Fay, who stated that she was there to clean the house. Sergeant White testified that when he asked Fay who else was inside the house, she said that she did not know because she had only been there a few minutes. Sergeant White continued to check the house for other occupants and discovered that there was a padlock on a door in the kitchen area. The officers also noticed that the chemical odor was especially strong near the door and that it appeared to be emanating from the room behind the locked door. Because the officers had "heard numerous footsteps as [they] were walking around the house" and were not "sure if someone was inside that door itself," Sergeant White broke the padlock and entered the room. Sergeant White stated that he could not have withdrawn from the house

2

without opening the padlocked door due to the risk that there was someone in the room who could have shot at the deputies, destroyed evidence, or otherwise turned the scene into a deadly situation.

{6}     When Sergeant White broke the lock, he encountered a strong chemical smell that pushed him back from the bedroom for a minute. The smell also made one of his deputies so dizzy that he had to pull back. After he checked the room and determined that no one was inside, Sergeant White left the house because he was only "in there for a protective sweep, which was [to] make sure [there were] no kids, . . . no other adults, no dangers to deputies on the outside." Based on what he had observed in the room and the strong chemical smell, Sergeant White determined that the officers required protective equipment to re-enter the home and called in a meth lab expert, Chief Deputy Encinias.

{7}     When Chief Deputy Encinias first arrived, she put on protective gear and entered the house to determine if everything was safe and if there was any danger of a fire or explosion. After determining that the chemicals did not pose an immediate danger, Chief Deputy Encinias left the house and obtained a search warrant. Chief Deputy Encinias then returned to the house and began to bring out the chemicals and equipment. Most of the chemicals were in the bathroom of the master bedroom. Chief Deputy Encinias also found a number of containers in the white cargo trailer behind the house. Chief Deputy Encinias stated that there were some bi-layer liquids in the home, which indicated that the meth "cook" had already taken place.

{8}     At the time of the fire and the subsequent search, Defendant was not at the house. However, Deputy Young discovered a large amount of mail with Defendant's name on it in the locked room that contained the majority of the meth lab equipment, and the individuals arrested at the scene identified Defendant as the owner of the home. As a result, Defendant was charged with manufacturing methamphetamine and conspiracy to manufacture methamphetamine.

{9}     At trial, in addition to the testimony of the police officers involved, the individuals found at the scene testified against Defendant. Green testified that the day before the fire, she and Charles Garcia had moved their camper onto the property behind the double-wide mobile home where Defendant and Rhonda lived. She stated that she had seen Defendant at the home the morning of the fire. She testified that Defendant "was very secretive" and "stayed in his room most of the time." Green admitted that she used methamphetamine, and she believed that her boyfriend got their meth from Defendant. Green also stated that she had gone to Walgreens with Defendant on May 10 to purchase pseudoephedrine.

{10}     Garcia testified that he and Green were in the process of moving to Albuquerque, but that they were staying at Defendant's house prior to the move. Garcia stated that on the day of the fire, he was burning some trash and the fire got out of control. Garcia testified that he was burning "acetone cans and stuff like that" that he and Defendant used for "manufacturing drugs." Garcia also testified that he had helped Defendant buy Sudafed from which they would extract ephedrine for use in the methamphetamine. Garcia stated that on the day before the fire, he and Green had gone to Albuquerque with Defendant to purchase

3

Sudafed. Finally, Garcia stated that he got his meth from Defendant and that he had gotten approximately half a gram from Defendant on May 11.

**{11}**   Defendant called four witnesses in his defense. The first, his mother, testified that on May 11, Defendant was at her house because he had "moved back in to help" take care of his grandson. The second, Defendant's brother's fiancée, testified that she saw Defendant at his mother's house on May 10 during a birthday party and that he had "been at his mom's . . . since around the end of April." Defendant's sister testified that she saw Defendant on May 10 at the birthday party but that she did not know where Defendant was on May 11. Finally, Defendant's younger brother testified that Defendant was living at his mother's house in late April and early May and that Defendant was at the birthday party on May 10.

**{12}**   The jury found Defendant guilty of manufacturing methamphetamine, conspiracy to manufacture methamphetamine, and possession of a stolen vehicle. Defendant appeals.

## DISCUSSION

### Exigent Circumstances Justified the Warrantless Search of Defendant's Home

**{13}**   Defendant first argues that the district court erroneously denied his request to suppress the physical evidence seized from the locked room in his home. At trial, Defendant contended that because Sergeant White broke the lock and entered the room without a warrant, all of the evidence obtained from the room was inadmissible. In response, the State argued that exigent circumstances required Sergeant White to enter the room. Specifically, the State noted that the officers had heard footsteps in the home, smelled a strong chemical smell emanating from the room, and were concerned that someone might be hiding in the room, or that the chemicals might present an immediate danger to the officers' safety. The district court agreed and denied Defendant's motion to suppress.

**{14}**   Our review of the district court's denial of a motion to suppress is a "mixed question of fact and law that we review de novo." *State v. Moore*, 2008-NMCA-056, ¶ 10, 144 N.M. 14, 183 P.3d 158 (internal quotation marks and citation omitted). "[W]e review the district court's findings of historical fact under a deferential, substantial evidence standard, and then we determine de novo if the facts, as so established, support the conclusion of exigent circumstances." *Id.* "Exigent circumstances are defined as those situations where immediate action is necessary to prevent imminent danger to life or serious damage to property, or to forestall the imminent escape of a suspect or destruction of evidence." *Id.* (internal quotation marks and citation omitted). We apply an objective standard and determine "whether in a given situation a prudent, cautious, and trained officer, based on facts known, could reasonably conclude that swift action was necessary." *Id.* (internal quotation marks and citation omitted).

**{15}**   Defendant correctly notes that suspicion of a meth lab alone is insufficient to justify a warrantless search under the exigent circumstances exception and that particularized information regarding the exigent circumstances justifying the entry into an active math lab is required for the exception to apply. *See State v. Johnson*, 2004-NMCA-064, ¶ 11, 135

4

N.M. 615, 92 P.3d 61, *aff'd in part, rev'd in part on other grounds*, 2006-NMSC-049, 140 N.M. 653, 146 P.3d 298. In *Johnson*, for example, we held that mere suspicion that there was an active meth lab inside a motel room was insufficient for the exigent circumstances exception to apply because there was no specific information that the officer's safety was at risk, that the defendant might destroy evidence, or that the lab itself might pose a risk. *Id.* ¶ 12.

{16}    Similarly, in *State v. Trudelle*, 2007-NMCA-066, ¶¶ 31-32, 142 N.M. 18, 162 P.3d 173, we held that exigent circumstances did not justify the search of a home where the only articulable fact used to justify the search was a chemical odor coming from the home. We noted that a chemical smell and suspicion of a meth lab are insufficient to create an exigent circumstance where there are no other articulable facts indicating that there is some type of danger. *Id.* ¶ 32. Specifically, we noted that there was no indication that an active cook was taking place, the officers were not concerned about their safety, and the chemical smell was not as strong near the house as it was in the driveway. *Id.* ¶ 31. In addition, while the officers testified that they were concerned about the safety of people in the house, they waited thirty minutes to gain entry into the house and allowed one of the homeowners to enter the house unaccompanied and without protective equipment. *Id.*

{17}    In *Moore*, 2008-NMCA-056, ¶¶ 1, 20, we also held that the search of a house was not justified by exigent circumstances. In that case, a police officer detected the odor of anhydrous ammonia emanating from a defendant's garage and, while peering into the garage, he was blasted in the face with chemical vapors that caused his eyes and lungs to burn. *Id.* ¶ 2. Following this, the officer performed a sweep of the defendant's house, although the officer did not see or hear anyone inside and had no other indication that there may have been anyone in the house. *Id.* ¶ 3. We noted that the fact that there was a strong chemical smell coming from the garage did "not . . . create an emergency situation in [the d]efendant's home, which was a separate building located some thirty to forty feet from the garage, and was not the source of the chemical release." *Id.* ¶ 15. In addition, we noted that there was no indication that the house created an immediate danger to the neighborhood, there were no facts suggesting that there might have been incapacitated individuals in the house, and there was no indication that there might have been someone inside the house who could destroy evidence or attempt to escape. *Id.* ¶¶ 16-19.

{18}    Here, unlike in *Trudelle* and *Moore*, the State presented evidence of exigent circumstances in addition to the smell of a meth lab. Specifically, the responding officers detected a strong chemical smell coming from the house and, after knocking on the door, heard "numerous footsteps" coming from within the house. Upon entering the home, the officers encountered Fay, who told the officers that she did not know if anyone else was in the house because she had only been there a few minutes. The officers then observed that the door to the master bedroom was padlocked from the outside and that the chemical odor was especially strong near the door. Sergeant White testified that he was concerned that Fay might have locked the door to the room with someone in it and that he needed to open the door to "make sure [there were] no kids, . . . no other adults, [and] no dangers to deputies on the outside." Sergeant White also stated that he could not have left the home without checking the locked room because there was a risk that someone could be hiding in the room who could have shot at the deputies, destroyed evidence, or turned the scene into a deadly

situation. When Sergeant White opened the door, he was confronted with a strong chemical odor that pushed him back from the door and made one of his deputies dizzy. The officers then immediately left the premises and called in Chief Deputy Encinias, the meth lab expert, who entered the house one more time prior to obtaining a search warrant "to make sure that nothing was amiss, that it [would not] explode or it [would not] start a fire."

**{19}**    Thus, rather than entering the home merely because of a suspicion that there was a meth lab inside, the officers in this case also had particularized information suggesting that there might be someone hiding in the house who could pose a threat or destroy evidence, and a concern that the meth cook was active and that it might explode or cause a fire. These facts, coupled with the smell of an active meth lab and the fire on the premises, created sufficient exigent circumstances to justify the warrantless search of the house for the limited purpose of a safety and welfare check. We therefore affirm the district court's order denying Defendant's motion to suppress the evidence.

## Sufficiency of the Evidence

**{20}**    Defendant next argues that the State failed to present sufficient evidence to support the jury's finding that he was guilty of manufacturing methamphetamine, conspiracy, and possession of a stolen vehicle. We address each of those arguments in turn.

## Standard of Review

**{21}**    "The test for sufficiency of the evidence is whether substantial evidence of either a direct or circumstantial nature exists to support a verdict of guilty beyond a reasonable doubt with respect to every element essential to a conviction." *State v. Riley*, 2010-NMSC-005, ¶ 12, 147 N.M. 557, 226 P.3d 656 (internal quotation marks and citation omitted). When applying this standard, we review "the evidence in the light most favorable to the guilty verdict, indulging all reasonable inferences and resolving all conflicts in the evidence in favor of the verdict." *Id.* (internal quotation marks and citation omitted). We do not substitute our judgment for that of the jury or reweigh the evidence "because the jury is free to reject [the d]efendant's version of the facts." *Id.* (alteration in original) (internal quotation marks and citation omitted).

## Manufacturing Methamphetamine

**{22}**    In order to convict Defendant of manufacturing methamphetamine, the State was required to prove that Defendant produced, prepared, compounded, converted, or processed methamphetamine and that he knew that it was methamphetamine. Defendant contends that the State failed to prove that he was on the premises where the meth lab was found and that there was no physical evidence showing that he took any steps in furtherance of the manufacture of methamphetamine. In addition, Defendant contends that the testimony that he was at his mother's house on May 11 is inconsistent with the testimony that he was at the meth lab that morning and that the jury was therefore not entitled to infer that he had any involvement with the lab.

6

**{23}** We note first that Defendant is essentially asking this Court to reweigh the evidence and conclude that the testimony Defendant presented was more credible than the testimony presented by the State. We do not reweigh the evidence on appeal. *Id.* We conclude that sufficient evidence supports his conviction for manufacture of methamphetamine.

**{24}** Green and Garcia testified that they were with Defendant when he purchased Sudafed on May 10, and Garcia testified that he and Defendant used the Sudafed to make meth. Garcia further testified that he burned acetone cans that he and Defendant had used to make meth, that he obtained his meth from Defendant, and that he got a half gram of meth from Defendant on May 11. As for Defendant's connection to the house where the meth lab was found, officers discovered mail with Defendant's name on it, both Garcia and Green testified that Defendant lived in the house, and Green stated that she had seen Defendant there on the morning of May 11, the day the meth lab was discovered.

**{25}** Moreover, the evidence Defendant presented was not inconsistent with the evidence the State presented. Defendant's witnesses testified that he was at a birthday party at his mother's house in Albuquerque on May 10, the day before the meth lab was discovered, and that he was at his mother's house on May 11, the day that the lab was discovered. However, the jury, as the fact finder, was free to either reject the testimony of Defendant's witnesses altogether or make the reasonable inference that Defendant was capable of being in more than one location on May 10 and 11.

**{26}** Based on the evidence presented, the jury could reasonably infer that Defendant manufactured methamphetamine. We affirm his conviction on this charge.

**Conspiracy**

**{27}** Defendant also argues that there was insufficient evidence that he intended to enter into a conspiracy to manufacture methamphetamine. We disagree. In order to convict Defendant of conspiracy, the jury was required to find that Defendant and another person agreed to commit the crime of manufacturing methamphetamine. At trial, Garcia testified that on May 10, he and Defendant, along with Green, had gone to Albuquerque to purchase Sudafed, which they needed for the methamphetamine. Green confirmed this in her testimony and stated that they each went into the store separately in order to buy a larger quantity of the pills. Chief Deputy Encinias testified that the first step in the manufacture of methamphetamine is the extraction of ephedrine from pseudoephedrine. Based on this evidence and the inference that Defendant actually manufactured methamphetamine the day after the trip to purchase Sudafed (as suggested by Chief Deputy Encinias's testimony that the cook had recently occurred), the jury could reasonably conclude that Defendant conspired to manufacture methamphetamine. We therefore affirm Defendant's conviction for conspiracy.

**Possession of a Stolen Vehicle**

**{28}** Defendant finally argues that there was insufficient evidence that he knowingly possessed a stolen vehicle. In order to convict Defendant of possession of a stolen vehicle,

the jury was required to find that Defendant had possession of a 1999 white Ford F-150, that the truck had been stolen, and that Defendant knew or had reason to know that it had been stolen. *See* NMSA 1978, § 66-3-505 (1978) (current version at NMSA 1978, Section 30-16D-4 (2009)).[1] Defendant argues that the State failed to show how the vehicle arrived at the scene, a direct link between the vehicle and Defendant, or that he knew or had reason to know that the vehicle had been stolen or unlawfully taken. In support of this argument, Defendant contends that the vehicle's proximity to Defendant's house alone is insufficient for the fact finder to determine that Defendant had knowledge of the vehicle or control of it. We disagree.

**{29}** Deputy Young testified that the truck was parked next to Defendant's home, was partially covered with a tarp, and had numerous parts removed. In addition, Deputy Young testified that he was unable to obtain fingerprints from the truck because "it was dusty." Viewing this evidence in the light most favorable to the jury's verdict, the jury could infer from the dust in the truck and the fact that numerous parts had been removed that the truck had been at Defendant's home for some time. Thus, the fact that Defendant was not at home at the time that the truck was discovered does not preclude the jury from inferring that Defendant possessed the truck. The fact that the truck was on Defendant's property, had been there for some time, and had been partially disassembled is sufficient to allow a reasonable juror to infer that Defendant possessed the vehicle.

**{30}** In addition, "since knowledge that property was stolen can seldom be proven by direct evidence, resort must often be made to circumstantial evidence." *State v. Smith*, 100 N.M. 352, 354, 670 P.2d 963, 965 (Ct. App. 1983), *abrogated on other grounds by*, *State v. Watkins*, 2008-NMCA-060, 144 N.M. 66, 183 P.3d 951. "Although mere possession of recently stolen property is not alone sufficient to sustain a conviction for receiving stolen property, possession not satisfactorily explained is a circumstance which may properly be taken into consideration with all other facts and circumstances in determining the guilt or innocence of the accused." *Smith*, 100 N.M. at 355, 670 P.2d at 966.

**{31}** Here, reviewing the evidence in the light most favorable to the verdict and indulging all inferences in favor of the verdict, we cannot say that there was insufficient evidence to support the conviction. The stolen truck was on Defendant's property and had been there for quite some time, and the truck was covered with a tarp, suggesting that the truck was being concealed from observation. From these circumstances, the jury could reasonably infer that Defendant had reason to know that the truck was stolen. Therefore, we affirm this conviction as well.

**CONCLUSION**

**{32}** For the foregoing reasons, we affirm the judgment of the district court.

---

[1]Section 66-3-505 was recompiled and amended in 2009 and is now contained in the criminal code at Section 30-16D-4. The provision at issue in this case is essentially the same in the recompilation.

8

**{33}    IT IS SO ORDERED.**

_____
**CYNTHIA A. FRY, Chief Judge**

**WE CONCUR:**

_____
**CELIA FOY CASTILLO, Judge**

_____
**TIMOTHY L. GARCIA, Judge**

**Topic Index for _State v. Brown_, Docket No. 28,371**

| | |
|---|---|
| **AE** | **APPEAL AND ERROR** |
| AE-SR | Standard of Review |
| | |
| **CL** | **CRIMINAL LAW** |
| CL-CL | Controlled Substances |
| CL-TV | Taking of Vehicle |
| | |
| **CA** | **CRIMINAL PROCEDURE** |
| CA-EC | Exigent Circumstances |
| CA-SE | Substantial or Sufficient Evidence |
| CA-WS | Warrantless Search |