IN THE SUPREME COURT OF THE STATE OF NEW MEXICO

Opinion Number:  2013-NMSC-020

Filing Date:  May 16, 2013

Docket No.  32,279

STATE OF NEW MEXICO,

　　　　Plaintiff-Appellee,

v.

BENJAMIN MONTOYA,

　　　　Defendant-Appellant.

APPEAL FROM THE DISTRICT COURT OF BERNALILLO COUNTY
Neil C. Candelaria, District Judge

Bennett J. Bauer, Acting Chief Public Defender
J.K. Theodosia Johnson, Assistant Appellate Defender
Santa Fe, NM

for Appellant

Gary K. King, Attorney General
Ralph E. Trujillo, Assistant Attorney General
Santa Fe, NM

for Appellee

## OPINION

**DANIELS, Justice.**

**{1}**　　Criminal prosecutions with multiple charges arising from a common fact situation often create difficult challenges, both in evaluating the offenses separately and in determining whether multiple punishments are permissible or appropriate under statutory and constitutional requirements.  Among the issues we consider in this direct appeal are two matters of significant precedential value.

**{2}**　　One issue involves the interrelationship between the theoretically separate offenses

1

of causing great bodily harm to a person by shooting at a motor vehicle and the homicide resulting from the penetration of the same bullet into the same person. We hold that current New Mexico jurisprudence precludes cumulative punishment for both crimes, and we therefore overrule *State v. Gonzales*, 113 N.M. 221, 824 P.2d 1023 (1992), and the cases that have followed it, including the divided opinions in *State v. Dominguez*, 2005-NMSC-001, 137 N.M. 1, 106 P.3d 563, and *State v. Riley*, 2010-NMSC-005, 147 N.M. 557, 226 P.3d 656.

**{3}** In addition, we hold that in a felony murder prosecution where the evidence will support a conviction for either second-degree murder or voluntary manslaughter, it is fundamental error for the felony murder essential elements jury instruction to omit the defining requirement that the accused did not act in the heat of passion as a result of the legally adequate provocation that would reduce murder to manslaughter.

## I. BACKGROUND

### A. Facts

**{4}** This case, like all too many that come before our courts, erupted from a toxic mixture of testosterone and guns. On the evening of July 15, 2007, Defendant Benjamin Montoya, his girlfriend, his seventeen-year-old brother, and several companions were gathered in the front yard of Defendant's family home. Defendant's parents were inside the house. A group of young men in a Cadillac automobile drove by, honking, yelling "Brewtown" (an Albuquerque gang name), and displaying gang signs. At least some of Defendant's group belonged to a rival gang, the Northside Locos.

**{5}** A few minutes later, the Cadillac returned and, along with a Ford Expedition and a third car, stopped at a nearby vacant lot. When the occupants continued yelling "Brewtown" and called Defendant's group over, Defendant and his friends started walking toward the vacant lot to confront approximately fifteen people who got out of the three stopped cars. Guns were pulled on both sides, and Defendant's brother was severely wounded by gunshots to his leg and abdomen. One of the Brewtown group also was shot.

**{6}** Defendant and his friends retreated to his home, dragging Defendant's brother to their driveway. The Brewtown group briefly chased Defendant and his friends before going back to their cars. The three cars initially left the area, but the Expedition turned around and came back toward Defendant's house. The person who had been shooting at Defendant and his friends was in the Expedition. When Defendant's mother saw the Expedition approach and saw gunfire coming out of the car, she yelled, "Here they come and they're still shooting."

**{7}** Defendant ran into his house and retrieved an AK-47 rifle. While his friends were trying to help his brother in the driveway and stop the bleeding from the gunshot wounds, Defendant ran outside and began shooting at the Expedition. The driver, victim Diego

2

Delgado, was shot seven times and died of multiple gunshot wounds, including one shot to the back of the head.

## B.    Proceedings

**{8}**    Among the nine felony counts on which Defendant was indicted, including shooting at a motor vehicle resulting in great bodily harm, was a homicide count charging a theory of deliberate first-degree murder of Diego Delgado or, in the alternative, a theory of first-degree felony murder, which was explained in the jury instructions as predicated on the felony of shooting at a motor vehicle.

**{9}**    At the conclusion of the trial, the jurors were given elements instructions on deliberate first-degree murder, with step-down instructions to consider second-degree murder if they could not find first-degree murder and then to consider voluntary manslaughter if they could not find second-degree murder.  After those instructions, the jurors were next instructed to consider a separate theory of felony murder committed "during the commission of Shooting at a Motor Vehicle."  While the second-degree murder instruction submitted as a step-down alternative to deliberate first-degree murder included the essential provocation element that distinguishes murder from manslaughter, the felony murder instruction made no reference to the provocation element, and the jury was not instructed in any other fashion that lack of sufficient provocation was an element of felony murder.

**{10}**    During its deliberations, the jury sent out a note to the court:  "We need some clarification on whether we must find guilty or not guilty on felony murder if we have already decided on manslaughter."  With the acquiescence of trial counsel, the court wrote a response that simply quoted the wording of an instruction previously given to the jury: "Each crime charged in the indictment should be considered separately."  No further response was given to the jury's question.

**{11}**    The jury ultimately returned verdicts finding Defendant guilty of both voluntary manslaughter, as a lesser included offense of first-degree deliberate murder, and first-degree felony murder based on the felony of shooting into a motor vehicle, in addition to a separate conviction of shooting at a motor vehicle resulting in great bodily harm.  The district court vacated the voluntary manslaughter and shooting at a motor vehicle convictions, leaving only the first-degree felony murder conviction, as required by New Mexico double jeopardy jurisprudence establishing that cumulative punishment may not be imposed for both felony murder and its lesser included predicate felony, *see State v. Frazier*, 2007-NMSC-032, ¶¶ 1, 40, 142 N.M. 120, 164 P.3d 1; *see also id.* ¶ 72 (Chávez, J., specially concurring), and that multiple homicide convictions may not be imposed on a defendant for a single death, *see State v. Santillanes*, 2001-NMSC-018, ¶ 5, 130 N.M. 464, 27 P.3d 456.

**{12}**    Raising a number of issues, Defendant appealed his convictions and life sentence directly to this Court.  *See* N.M. Const. art. VI, § 2 ("Appeals from a judgment of the district

court imposing a sentence of death or life imprisonment shall be taken directly to the supreme court."); *accord* Rule 12-102(A)(1) NMRA.

## II.   DISCUSSION

### A.   Because Lack of Provocation Was an Essential Element That Distinguished Felony Murder from Voluntary Manslaughter, Failure to So Instruct the Jury Was Fundamental Error

**{13}**   We first address whether Defendant's conviction for felony murder should be reversed because the felony murder essential elements jury instruction omitted any reference to the concept of legally sufficient provocation that distinguishes heat-of-passion voluntary manslaughter from cold-blooded second-degree murder.

**{14}**   Because Defendant's trial counsel made no objection to the jury instruction, we review for fundamental error. *See State v. Osborne*, 111 N.M. 654, 662, 808 P.2d 624, 632 (1991) (explaining that the failure to instruct the jury on the essential elements of an offense may constitute fundamental error, even if the defendant failed to object to an inadequate instruction).  Under fundamental error review, we will not reverse the jury verdict unless it is necessary to prevent a "miscarriage of justice." *State v. Silva*, 2008-NMSC-051, ¶ 13, 144 N.M. 815, 192 P.3d 1192 (internal quotation marks and citation omitted).  In applying the fundamental error analysis to deficient jury instructions, we are required to reverse when the misinstruction leaves us with "no way of knowing whether the conviction was or was not based on the lack of the essential element." *State v. Swick*, 2012-NMSC-018, ¶¶ 46, 58, 279 P.3d 747 (holding that it was fundamental error to fail to instruct on the second-degree murder element of lack of sufficient provocation).  In this case, it is highly likely that the felony murder guilty verdict was based on the lack of an essential element in the definitional jury instruction.

**{15}**   Under New Mexico law, felony murder is a second-degree murder that is elevated to first-degree murder when the murder was committed during the commission or attempted commission of some other dangerous felony. *See* NMSA 1978, § 30-2-1(A)(2) (1994); *Frazier*, 2007-NMSC-032, ¶ 8 (observing that "in order to convict a defendant of felony murder, the State must prove that the defendant had a culpable state of mind sufficient to support a conviction for second-degree murder").  Accordingly, a determination of whether an accused has committed felony murder necessarily requires a factfinder to determine whether the accused has committed second-degree murder; simply stated, if there is no second-degree murder, there can be no felony murder.

**{16}**   The Legislature has textually defined second-degree murder as excluding killings committed in the heat of passion:

> Unless he is acting upon sufficient provocation, upon a sudden quarrel or in the heat of passion, a person who kills another human being

4

without lawful justification or excuse commits murder in the second degree if in performing the acts which cause the death he knows that such acts create a strong probability of death or great bodily harm to that individual or another.

Section 30-2-1(B). A heat-of-passion intentional killing, defined as "the unlawful killing of a human being without malice . . . committed upon a sudden quarrel or in the heat of passion," is punishable as the lesser offense, voluntary manslaughter. NMSA 1978, § 30-2-3(A) (1994).

**{17}** Mitigation of a killing from murder to manslaughter requires legally sufficient "provocation," defined in our Uniform Jury Instructions and case law as "any action, conduct or circumstances which arouse anger, rage, fear, sudden resentment, terror or other extreme emotions" that would "cause a temporary loss of self control in an ordinary person." UJI 14-222 NMRA; *see State v. Stills*, 1998-NMSC-009, ¶ 36, 125 N.M. 66, 957 P.2d 51 (discussing sufficient provocation).

**{18}** As we recently emphasized in *Swick*, 2012-NMSC-018, ¶ 48, our Uniform Jury Instructions explicitly require inclusion of the essential element of lack of provocation in a second-degree murder elements instruction whenever it is an issue the jury should consider. That is why we provide two separate uniform elements instructions for second-degree murder. One, for use when provocation is in issue, instructs jurors that they cannot convict of second-degree murder unless they find that the defendant "did not act as a result of sufficient provocation." UJI 14-210 NMRA. The other, which the use notes caution is "to be used only when second degree murder is the lowest degree of homicide to be considered by the jury," makes no reference to the provocation element. UJI 14-211 NMRA n.1.

**{19}** Whether Defendant's killing of Diego Delgado was committed upon a sudden quarrel or in the heat of passion was very much at issue in this case, as reflected in the district court's instructions that the jury must consider voluntary manslaughter in the stepdown from deliberate first-degree murder, the alternative to felony murder. The jury would have been justified in finding that the sudden violent attack aroused anger, rage, fear, sudden resentment, terror or other extreme emotions in Defendant, particularly in light of the evidence that his brother had just been shot and that a car containing armed assailants was bearing down on Defendant, his family home, and his wounded brother. We recognize that there will be situations in which a defendant's own misconduct may preclude a provocation instruction. *See, e.g.*, *State v. Gaitan*, 2002-NMSC-007, ¶ 13, 131 N.M. 758, 42 P.3d 1207 (holding that "the law does not permit one who intentionally instigates an assault on another to then rely on the victim's reasonable response to that assault as evidence of provocation sufficient to mitigate the subsequent killing of the victim from murder to manslaughter"); *State v. Munoz*, 113 N.M. 489, 827 P.2d 1303 (Ct. App. 1992) (recognizing that "a defendant cannot pose a threat to the victim and then rely on the victim's response as a legal provocation"), *cert. denied*, *Munoz v. State*, 113 N.M. 352, 826 P.2d 573 (1992). This case does not present any such concerns. There was ample evidence that victim Diego Delgado's

provocative conduct against Defendant and his family was not the result of any felonious behavior on Defendant's part and that the provocative conduct occurred before Defendant committed the predicate felony of shooting into the victim's car.

**{20}** But despite the fact that the jury instructions properly contained the essential element of lack of provocation in the second-degree instruction that was given as a lesser included offense of deliberate first-degree murder, the provocation element was omitted from the essential elements of second-degree murder in the separate felony murder instruction. The omission may well have been the result of the failure of our felony murder Uniform Jury Instruction to address all second-degree murder essential elements, including specifically the element of lack of provocation where that may be in issue, an omission which we now request our Committee on Uniform Jury Instructions for Criminal Cases to address. *Compare* UJI 14-210 (second-degree murder, which includes lack of provocation as an essential element), *with* UJI 14-202 NMRA (felony murder, which makes no reference to the element of lack of provocation). There was no other instruction given which would have informed the jury in any way that lack of provocation was as much an element of second-degree murder as an included offense of felony murder as it was of stand-alone second-degree murder.

**{21}** Failure to include this important distinction between second-degree murder and voluntary manslaughter under the facts of this case was fundamental error. *See Swick*, 2012-NMSC-018, ¶¶ 55-56, 58 (holding that it was fundamental error to fail to instruct the jury that the state had the burden of proving beyond a reasonable doubt that the defendant did not act as a result of sufficient provocation in order to return a second-degree murder conviction where heat of passion was at issue). We therefore must reverse Defendant's conviction for felony murder.

**B. The Double Jeopardy Clause Precludes Defendant's Retrial for Felony Murder as a Result of the Jury's Verdict Acquitting Him of Second-Degree Murder and Finding Him Guilty of Voluntary Manslaughter Instead**

**{22}** The jury's separate verdicts finding Defendant guilty of (1) heat-of-passion voluntary manslaughter rather than second-degree murder and (2) first-degree felony murder for the same homicide raise a double jeopardy issue, "a question of law, which we review de novo." *State v. Saiz*, 2008-NMSC-048, ¶ 22, 144 N.M. 663, 191 P.3d 521, *abrogated on other grounds by State v. Belanger*, 2009-NMSC-025, ¶ 36 n.1, 146 N.M. 357, 210 P.3d 783.

**{23}** The Double Jeopardy Clause of the United States Constitution guarantees: "[N]or shall any person be subject for the same offense to be twice put in jeopardy of life or limb." U.S. Const. amend. V. This terse prohibition often presents difficulties in analysis, in part because it has been held to incorporate a broad and general collection of protections against several conceptually separate kinds of harm: (1) "a second prosecution for the same offense after acquittal," (2) "a second prosecution for the same offense after conviction," and (3) "multiple punishments for the same offense." *Swafford v. State*, 112 N.M. 3, 7, 810 P.2d

6

1223, 1227 (1991) (citing *North Carolina v. Pearce*, 395 U.S. 711, 717 (1969)). The issue we address here relates to the first of those protections, reprosecution after an acquittal.

**{24}** Had the State submitted only the felony murder theory of homicide to the jury, our holding that the elements instruction failed to include an accurate and complete definition of the lesser included offense of second-degree murder would result in a remand for retrial. *See Swick*, 2012-NMSC-018, ¶ 58 (remanding for a new trial as a result of a missing provocation element in a second-degree murder instruction). The same would be the case if the jury had returned only a general verdict of guilty of first-degree murder, without specifying whether the verdict was based on a felony murder or a deliberate murder theory. *See State v. Mailman*, 2010-NMSC-036, ¶ 12, 148 N.M. 702, 242 P.3d 269 (holding that "a conviction under a general verdict must be reversed where it is based on more than one legal theory and at least one of those theories is legally, as opposed to factually, invalid").

**{25}** But in this case we know that the jury actually deliberated and decided whether Defendant committed second-degree murder as a lesser included offense of the alternative theory of first-degree murder. The jury, properly instructed on the distinction between second-degree murder and voluntary manslaughter and instructed to consider voluntary manslaughter only if it could not convict of second-degree murder, effectively acquitted Defendant of second-degree murder by convicting Defendant of the lesser offense of voluntary manslaughter instead. *See State v. Lynch*, 2003-NMSC-020, ¶ 10, 134 N.M. 139, 74 P.3d 73 (discussing the American doctrine that a conviction of a lesser included offense is an implied acquittal of the greater offense that was considered by the same factfinder); *id.* ¶ 37 (Maes, C.J., dissenting but agreeing that the Double Jeopardy Clause of the New Mexico Constitution, Article II, Section 15, incorporates the implied acquittal doctrine). And because "acquittal of a lesser offense necessarily included in a greater offense bars a subsequent prosecution for the greater offense," *State v. Tanton*, 88 N.M. 333, 335, 540 P.2d 813, 815 (1975), Defendant's acquittal of second-degree murder, a lesser included offense of felony murder, bars a subsequent trial for the greater offense of felony murder.

**{26}** Submitting separate verdict forms for the two alternative theories of first-degree murder and requiring the jury to return both verdicts in this case was a commendable approach by the trial judge, making it possible for both the trial court and a reviewing court to know exactly what the jury did and did not determine and thereby minimizing the need to submit the case to a second jury in the event of a reversible error in connection with one of the alternative theories.

**{27}** We therefore hold that Defendant, having been acquitted of second-degree murder, is constitutionally protected from further prosecution for that offense, whether in a stand-alone count, as a stepdown from deliberate first-degree murder, or as a component of felony murder. *See Ashe v. Swenson*, 397 U.S. 436, 446 (1970) (holding that collateral estoppel is a constitutional component of double jeopardy protection in criminal cases and that, after a jury determines a factual issue against the state, the state may not bring a defendant before a new jury to litigate the same issue again).

7

**C. Defendant May Not Be Punished Cumulatively for Both Manslaughter and Causing Great Bodily Harm by Shooting at a Motor Vehicle Where Both Convictions Are Based on the Same Shooting of the Same Victim**

**{28}** Because we must vacate Defendant's felony murder conviction, we next consider reinstating the two convictions the district court vacated solely because Defendant was also convicted of felony murder, the convictions of voluntary manslaughter and shooting at a motor vehicle resulting in great bodily harm. Defendant argues, however, that reinstatement of both convictions for the act of shooting a single victim would constitute double jeopardy of the third type, multiple punishment for the same offense.

**{29}** Honoring the law's protection against multiple punishments for "the same offense" is one of the most vexing challenges of double jeopardy jurisprudence. *See, e.g.*, *Albernaz v. United States*, 450 U.S. 333, 343 (1981) (observing that "the decisional law in the area is a veritable Sargasso Sea which could not fail to challenge the most intrepid judicial navigator"). In addition to requiring a narrow and mechanical analysis of generic statutory elements, the inquiry often calls for a broader and substantially more complex search for indicia of legislative intent in the context of particular cases. *See Swafford*, 112 N.M. at 13, 810 P.2d at 1233 (noting that when a defendant's conduct violates more than one statute, the courts must determine whether the Legislature intended multiple punishments). Determinations of legislative intent, like double jeopardy, present issues of law that "are reviewed de novo, with the ultimate goal of such review to be facilitat[ing] and promot[ing] the legislature's accomplishment of its purpose." *State v. Tafoya*, 2012-NMSC-030, ¶ 11, 285 P.3d 604 (alterations in original) (internal quotation marks and citation omitted).

**{30}** We agree with the State's concession on appeal that Defendant's act of shooting the driver of the Expedition was the common factual basis for both the shooting into the motor vehicle and the voluntary manslaughter convictions, and his culpable conduct was therefore "unitary." *See Gonzales*, 113 N.M. at 224, 824 P.2d at 1026 (concluding that the firing of "multiple gun shots into [the victim's vehicle] in rapid succession" constituted unitary criminal conduct). If Defendant were challenging multiple convictions under the same statute, our determination of unitary conduct would require the conclusion that the Double Jeopardy Clause prohibits multiple punishment, without any further analysis on our part. *State v. Gallegos*, 2011-NMSC-027, ¶ 33, 149 N.M. 704, 254 P.3d 655 ("[I]f the defendant was charged with multiple violations of the same statute, a unit-of-prosecution case, then the only question to be answered in determining whether two charges are the 'same offense' is whether the defendant's conduct underlying each charge was part of the 'same act or transaction' as defined by the legislature." (alteration in original) (internal quotation marks and citation omitted)). But because this is a "double-description case, where the same conduct results in multiple convictions under different statutes," we must go further before our analysis is complete. *Swick*, 2012-NMSC-018, ¶ 10.

**{31}** The easiest step in the double-description analysis is to conduct the strict elements test established by the United States Supreme Court more than 80 years ago to determine in

the abstract whether each statutory offense "'requires proof of a fact which the other does not.'" *Id.* ¶ 12 (quoting *Blockburger v. United States*, 284 U.S. 299, 304 (1932)). "If that test establishes that one statute is subsumed within the other, the inquiry is over and the statutes are the same for double jeopardy purposes—punishment cannot be had for both." *Swafford*, 112 N.M. at 14, 810 P.2d at 1234. Although the *Blockburger* test has the virtue of simplicity, it has been justly criticized as a "mechanical test that compares statutory elements and is only sometimes related to substantive sameness." George C. Thomas III, *A Blameworthy Act Approach to the Double Jeopardy Same Offense Problem*, 83 Calif. L. Rev. 1027, 1028 (1995).

**{32}** In this case, as in many of the more difficult double punishment cases involving different statutes, *Blockburger*'s simplistic elements test provides no final resolution. Neither the manslaughter statute nor the shooting into a motor vehicle statute is definitionally subsumed within the other; only the offense of manslaughter requires the death of a human being, and only the offense of shooting at a motor vehicle resulting in great bodily harm requires that the harm to the victim be the result of shooting into a vehicle. We therefore must proceed to the most challenging step of the double jeopardy analysis, trying to determine whether the Legislature intended to impose cumulative punishment for unitary conduct violating two statutes that survive the *Blockburger* elements test. In doing so, "we must turn to traditional means of determining legislative intent: the language, history, and subject of the statutes," and we "must identify the particular evil sought to be addressed by each offense." *Swafford*, 112 N.M. at 14, 810 P.2d at 1234. "If several statutes are not only usually violated together, but also seem designed to protect the same social interest, the inference becomes strong that the function of the multiple statutes is only to allow alternative means of prosecution." *Id.*

**{33}** The Legislature is the branch of government constitutionally vested with the authority to define criminal offenses and prescribe permissible punishment for their violation, and it is the duty of the judicial branch to attempt to discern and effectuate the legislative will. *See, e.g.*, *State v. Martinez*, 1998-NMSC-023, ¶ 14, 126 N.M 39, 966 P.2d 747 ("It is the duty of the judiciary, in implementing the directives of the Legislature, to exercise reason and ensure that the ends of justice are met."); *State ex rel. Helman v. Gallegos*, 117 N.M. 346, 353, 871 P.2d 1352, 1359 (1994) ("[W]e believe it to be the high duty and responsibility of the judicial branch of government to facilitate and promote the legislature's accomplishment of its purpose."). Unfortunately, the Legislature rarely provides textual guidance on its wishes regarding cumulative or alternative punishment. In the absence of explicit legislative direction, determining what the Legislature intended—or perhaps more accurately, what the Legislature most likely would have intended had it contemplated the potential overlap between particular statutes—is a task for which there is no simple test. The problem is exacerbated by the ever increasing number and complexity of criminal statutes:

> [A]t common law, and under early federal criminal statutes, offense categories were relatively few and distinct. A single course of criminal

conduct was likely to yield but a single offense. In more recent times, with the advent of specificity in draftsmanship and the extraordinary proliferation of overlapping and related statutory offenses, it became possible for prosecutors to spin out a startlingly numerous series of offenses from a single alleged criminal transaction.

*Ashe*, 397 U.S. at 445 n.10 (citation omitted).

**{34}** This Court has been wrestling with the double jeopardy concerns raised by the substantial overlap between the two specific statutes in this case for more than two decades. We have always recognized that the preliminary and simplistic *Blockburger* elements test did not provide a final answer to the substantive sameness question, but we have had increasing difficulty reconciling past legislative intent analyses of these statutes with the application of our developing double jeopardy jurisprudence to various other statutes.

**{35}** Our first consideration of the overlap between these two statutes was in *Gonzales*, 113 N.M. at 225, 824 P.2d at 1027, where we upheld convictions for both first-degree murder and causing great bodily harm by shooting at a motor vehicle, based on the unitary conduct of fatally shooting a victim sitting in a car. The three justices who spoke for the *Gonzales* Court relied primarily on a narrow *Blockburger* statutory elements analysis, noting that the "murder statute requires proof of the unlawful killing of a human being" while the "shooting at an occupied motor vehicle statute requires proof of discharging a firearm at an occupied vehicle but does not require the killing of a human being." *Gonzales*, 113 N.M. at 224-25, 824 P.2d at 1026-27.

**{36}** In a brief application of the *Swafford* nontechnical legislative intent analysis, this Court concluded, seven months after *Swafford*, that the two statutes were intended to address different social evils, reasoning that the murder statute was intended to address unlawful killing of people and the shooting at a motor vehicle statute was "more narrowly designed to protect the public from reckless shooting into a vehicle and the possible property damage and bodily injury that may result." *Gonzales*, 113 N.M. at 225, 824 P.2d at 1027. After noting that although the statutes "may be violated together, they are not necessarily violated together," and that "punishment for a violation of either statute is not enhanced for a violation of the other statute," the Court concluded that a defendant could be cumulatively punished both for first-degree murder and for causing great bodily harm by shooting into a motor vehicle, based on the same physical act, without violating double jeopardy protections. *Id.*

**{37}** Thirteen years after *Gonzales*, this Court found itself sharply divided over the continued viability of that holding. The three-justice *Dominguez* majority reaffirmed *Gonzales* and its rationales in affirming convictions for both voluntary manslaughter and causing great bodily harm by shooting into a motor vehicle. *See Dominguez*, 2005-NMSC-001, ¶¶ 8, 14, 16. Two justices authored separate dissents, primarily on the grounds that (1) the *Gonzales* holding had been undermined by the holding in *Santillanes* and other post-

*Gonzales* cases recognizing the double jeopardy principle that "for a single death, there can be only one conviction" and (2) *Gonzales* was inconsistent with more recent developments in New Mexico double jeopardy jurisprudence. *See Dominguez*, 2005-NMSC-001, ¶ 28 (Bosson, C.J., concurring in part and dissenting in part); *id.* ¶ 37 (Chávez, J., dissenting).

**{38}** We next confronted essentially the same issue in *Riley*. Once again this Court was unable to reach a consensus, but this time three justices wrote separately to express their concerns that *Gonzales* was increasingly out of step with New Mexico double jeopardy jurisprudence. *See Riley*, 2010-NMSC-005, ¶ 39 (Chávez, C.J., specially concurring); *id.* ¶ 44 (Bosson, J., concurring in part and dissenting in part); *id.* ¶ 46 (Daniels, J., specially concurring). The four opinions in *Riley* made it clear that if defense counsel had met this Court's requirements for challenging a binding precedent and seeking to overcome the principle of stare decisis, the continued viability of *Gonzales* would have been in grave doubt. *See Riley*, 2010-NMSC-005, ¶¶ 32-35 (plurality opinion of Serna, J., joined by Maes, J.) (noting that counsel had not identified or argued precedent-overruling principles); *id.* ¶¶ 39-43 (Chávez, C.J., specially concurring) (noting continued disagreement with *Gonzales* and *Dominguez* but declining to "overturn controlling precedent . . . [without] benefit of full briefing and argument on the relevant factors" for doing so); *id.* ¶¶ 44-45 (Bosson, J., concurring in part and dissenting in part) (reiterating disagreement with *Gonzales* and *Dominguez* and observing that the challenge to those precedents "would best be initiated by the parties themselves and not by this Court acting sua sponte); *id.* ¶¶ 46-49 (Daniels, J., specially concurring) (expressing the view that "the Legislature did not intend to punish a person cumulatively for both crimes, simply because a bullet penetrated a motor vehicle before killing its intended victim" but joining in affirmance on grounds of stare decisis because a case had not been made for overruling established precedent).

**{39}** In this case, Defendant has squarely raised, briefed, and argued specific reasons for overruling *Gonzales* and the cases that have followed it, particularly *Dominguez* and *Riley*. We therefore must conduct the jurisprudential analysis that was not called for in *Riley*.

**{40}** When deciding whether to overrule our own precedents, this Court considers such common-sense factors as whether the precedent is "a remnant of abandoned doctrine," whether the precedent has proved to be unworkable, whether changing circumstances have deprived the precedent of its original justification, and the extent to which parties relying on the precedent would suffer hardship from its overruling. *Riley*, 2010-NMSC-005, ¶ 34 (plurality opinion) (internal quotation marks and citation omitted). When any of those factors "convincingly demonstrates that a past decision is wrong, the Court has not hesitated to overrule even recent precedent." *State v. Pieri*, 2009-NMSC-019, ¶ 21, 146 N.M. 155, 207 P.3d 1132 (internal quotation marks and citation omitted).

**{41}** In order to afford due respect to the principles of stare decisis and to conduct a principled reconsideration of *Gonzales*'s continued precedential soundness, we begin with a thorough review of the more significant developments in our double jeopardy jurisprudence during the two decades since *Gonzales* was decided.

11

**{42}** In *State v. Contreras*, nearly four years after *Gonzales*, this Court applied *Swafford* and unanimously held for the first time that when "one's conduct is unitary, one cannot be convicted of and sentenced for both felony murder and the underlying felony." *Contreras*, 120 N.M. 486, 491, 903 P.2d 228, 233 (1995) (overruling the contrary precedent of *State v. Stephens*, 93 N.M. 458, 463, 601 P.2d 428, 433 (1979)). We later took the analysis a step further and held that the Legislature did not intend that dual convictions for both felony murder and its predicate felony be imposed in any case, without the need for a particularized case-by-case unitary conduct analysis. *Frazier*, 2007-NMSC-032, ¶¶ 4, 11, 35 (addressing felony murder and kidnapping). Both *Contreras*, 120 N.M. at 491, 903 P.2d at 233, and *Frazier*, 2007-NMSC-032, ¶ 26, were based on reasoned inferences of what punishment the Legislature intended, in the absence of explicit legislative direction.

**{43}** The reasoning underlying *Gonzales* was substantially eroded by *State v. Cooper* and *Santillanes*. In *Cooper*, we recognized that the Double Jeopardy Clause precluded dual convictions for felony murder and second-degree murder in the killing of the same victim. *See* 1997-NMSC-058, ¶¶ 53, 63, 124 N.M. 277, 949 P.2d 660. In *Santillanes*, we held that a defendant could not be punished separately for vehicular homicide and child abuse resulting in death, even though the statutes each contained an element the other did not have and thereby passed the *Blockburger* test. *See Santillanes*, 2001-NMSC-018, ¶¶ 5, 24. We specifically affirmed the reasoning of the Court of Appeals "that one death should result in only one homicide conviction" under New Mexico law. *Id.* ¶ 5 (internal quotation marks and citation omitted).

**{44}** Even though the dual statutes involved in both *Cooper*, 1997-NMSC-058, ¶¶ 53-54, 60, and *Santillanes*, 2001-NMSC-018, ¶ 8, required causation of death as an essential element while one of the two statutes in this case requires only great bodily harm, the significance of those two cases is underscored by our holding in *State v. Varela*, 1999-NMSC-045, 128 N.M. 454, 993 P.2d 1280. Among other convictions appealed by Varela that arose from his shooting and killing the occupant of a house was a conviction for the offense of shooting at a dwelling and causing great bodily harm. *See id.* ¶ 1. That crime is defined in a separate provision of the very statute involved in this case; but for the differing elements of a dwelling and a motor vehicle, the two subsections are identical. *Compare* NMSA 1978, § 30-3-8(A) (1993) (shooting at a dwelling), *with* § 30-3-8(B) (shooting at a motor vehicle). The defendant in *Varela* argued that the statutory element of "great bodily harm" could not be established by proof of a killing. *See Varela*, 1999-NMSC-045, ¶ 10. This Court upheld the conviction by interpreting the great bodily harm element to include causation of death, in language that is difficult to reconcile with the reasoning in *Gonzales*:

> [T]he wrong the legislature sought to remedy [in the first sentence of Section 30-3-8(A)] is any shooting at a dwelling or occupied dwelling [sic]. The next three sentences assign a level of punishment to three different fact patterns: a shooting at a dwelling or building that does not result in great bodily harm; one that results in injury to another person; and one that results in great

12

bodily harm. *See* § 30-3-8. If we construe the first sentence according to its terms, as prohibiting any shooting at a dwelling or occupied building, then the circumstance in which the shooting results in death must be viewed as falling into one of the three levels of punishment. "[O]ur construction must not render the statute's application absurd, unreasonable, or unjust." To construe the statute as not including situations in which the victim dies would render Section 30-3-8's application absurd.

*Varela*, 1999-NMSC-045, ¶ 13 (second alteration in original) (internal citation omitted).

**{45}** *Varela* is important in our consideration of *Gonzales* because it recognized that death is a part of the harm the Legislature sought to protect against in enacting drive-by shooting offenses. *Varela* is equally significant in its recognition that the drive-by crimes are obviously intended to protect against threats to personal safety, and not to threats to property as *Gonzales* had proposed. *Varela*'s interpretation is supported by the fact that penalty gradations for drive-by shooting, Section 30-3-8(B), like penalties for other assaultive crimes contained within the Article Three assault and battery provisions of the New Mexico Criminal Code, NMSA 1978, Sections 30-3-1 to -18 (1963, as amended through 2010), are based on differing degrees of potential or actual personal harm to a human victim, unlike the Article Fifteen property damage provisions of the Criminal Code, NMSA 1978, Sections 30-15-1 to -7 (1963, as amended through 2007), the gradations of which are based on differing values of property damaged or stolen. *Compare, e.g.*, § 30-3-4 (battery), *and* § 30-3-5 (aggravated battery), *and* § 30-3-9(E) (battery on a school employee), *and* § 30-3-9(F) (aggravated battery on a school employee), *with* § 30-15-1 (criminal damage to property), *and* § 30-15-1.1 (graffiti damage to property).

**{46}** Our double jeopardy jurisprudence has continued to grow away from the historical strict mechanical elements test and increasingly toward a substantive sameness analysis. In *Gallegos*, 2011-NMSC-027, ¶ 1, we applied our "double jeopardy jurisprudence to multiple conspiracy convictions" and "set a new course for the future application of double jeopardy principles" by holding that multiple conspiracy convictions could not be imposed for a single agreement to violate more than one criminal statute. In light of double jeopardy concerns and given the inherent dangers of overcharging, we recognized that "it is particularly important that the judiciary embrace its unique responsibility to assure the basic fairness and adherence to legislative intent that only the courts can afford." *Id.* ¶ 47. Accordingly, we concluded that "a fair inference to draw from the text, history, and purpose of our conspiracy statute is that the Legislature established . . . a rebuttable presumption that multiple crimes are the object of only one, overarching, conspiratorial agreement subject to one, severe punishment set at the highest crime conspired to be committed." *Id.* ¶ 55.

**{47}** In *State v. Gutierrez*, 2011-NMSC-024, ¶¶ 52-53, 60, 150 N.M. 232, 258 P.3d 1024, we held that convictions for both armed robbery of a car and its keys, based on the forcible seizure of its keys, and the separate offense of theft of a motor vehicle constituted double jeopardy. In doing so, we questioned the continued validity of *State v. McGruder*,

13

1997-NMSC-023, 123 N.M. 302, 940 P.2d 150, *abrogated on other grounds by State v. Chavez*, 2009-NMSC-035, ¶ 16, 146 N.M. 434, 211 P.2d 891, which had found no double jeopardy violation where separate convictions were affirmed for both armed robbery of a set of car keys and the resulting theft of the motor vehicle for which the keys were taken. *See Gutierrez*, 2011-NMSC-024, ¶ 53 (discussing distinguishable conduct in support of the separate charges in *McGruder*). Significantly for the present case, we rejected a mechanical approach that would find no double jeopardy violation simply because two statutory offenses had differing elements. *See id.* ¶ 58. Instead, we expressly "modified the *Blockburger* analysis to be used in New Mexico" and "rejected the . . . strict elements test." *Swick*, 2012-NMSC-018, ¶ 21. In a concurring opinion, Justice Bosson observed that the majority's inclination to look beyond abstract theory and consider concrete realities resulted in the implicit overruling of *McGruder* and exemplified how the Court has been "rethinking some of the underpinnings of our double jeopardy jurisprudence." *See Gutierrez*, 2011-NMSC-024, ¶¶ 73-74, 76, 78 (Bosson, J., specially concurring).

**{48}**   In *Swick*, our most recent significant double jeopardy precedent, we relied on *Gutierrez* to overrule *State v. Armendariz*, 2006-NMSC-036, 140 N.M. 182, 141 P.3d 526, and held that our current double jeopardy jurisprudence precludes multiple convictions for both aggravated battery and attempted murder where both convictions are based on the unitary conduct of beating a victim. *See Swick*, 2012-NMSC-018, ¶¶ 19, 21 (overruling *Armendariz*).

**{49}**   *Swick* rejected *Armendariz*'s double jeopardy statutory analysis, which cited *Gonzales*, *see Armendariz*, 2006-NMSC-036, ¶ 25, and proceeded in much the same way as the two-decade-old *Gonzales* analysis of the offenses of homicide and causing great bodily harm by shooting into a motor vehicle. *See Swick*, 2012-NMSC-018, ¶¶ 13, 19. *Armendariz* first applied a strict *Blockburger* elements test, determining that the statute defining attempted murder requires proof of intent to commit murder, which is not an element required to prove aggravated battery, and that the aggravated battery statute requires an unlawful application of force, which is not an element of attempted murder. *See Armendariz*, 2006-NMSC-036, ¶¶ 23-24. *Armendariz* then used other indicia to justify its holding that the Legislature had intended to allow cumulative punishments, *see id.* ¶¶ 22, 25, as we described in *Swick*:

> First, . . . attempted murder and aggravated battery were enacted to address different social harms, punishing the state of mind in attempted murder and punishing actual harm in aggravated battery. Second, . . . there was no language in either statute which indicated an intent that these crimes were alternative ways of committing the same crime. Third, . . . the two crimes do not necessarily have to be violated at the same time. In other words, a defendant can commit attempted murder without also committing battery.

2012-NMSC-018, ¶ 16 (citations omitted). *Swick* followed the teachings of *Gutierrez* and reaffirmed that a complete double jeopardy analysis may require looking beyond facial

14

statutory language to the actual legal theory in the particular case by considering such resources as the evidence, the charging documents, and the jury instructions. *See Swick*, 2012-NMSC-018, ¶¶ 21, 26. "[T]he State proffered the same testimony to prove the aggravated batteries as it did to prove the attempted murders, which was that Swick beat, stabbed, and slashed" his victims. *Id.* ¶ 26.

**{50}** *Swick* rejected *Armendariz*'s narrow view that the two statutes were enacted to address different social evils, aggravated battery to protect against bodily injury and attempted murder to protect against loss of life:

> Both statutes punish overt acts against a person's safety but take different degrees into consideration. The aggravated battery statute concerns itself with the intent to harm and the attempted murder statute concerns itself with the intent to harm fatally.

*Swick*, 2012-NMSC-018, ¶ 29.

**{51}** *Swick* also reaffirmed the established principle that lenity applies in cases of ambiguity regarding the reach of criminal statutes, "because reasonable minds can differ as to the Legislature's intent in punishing the[] two crimes." *Id.* ¶ 30.

**{52}** In light of the significant journey our double jeopardy jurisprudence has taken over the past two decades, we conclude that "time has set its face against" *Gonzales*'s doctrinal underpinnings. *Mapp v. Ohio*, 367 U.S. 643, 653 (1961) (overruling *Wolf v. Colorado*, 338 U.S. 25 (1949), because the line of authority it relied on had evolved). *Gonzales* and its progeny reflect a remnant of abandoned doctrine that has been deprived of its original justification. "We conclude that the modifications to double jeopardy jurisprudence make this Court's opinion [in *Gonzales*] so unworkable as to be intolerable." *Swick*, 2012-NMSC-018, ¶ 19. It is impossible to reconcile in any principled way the reasoning of *Gonzales* with the reasoning of the more recent precedents we have reviewed here. Applying those precedents and the rule of lenity, we can no longer conclude that the Legislature intended that Defendant should receive more than the maximum punishment it determined appropriate for either a drive-by shooting or a completed homicide, taking into consideration the relationship between the statutory offenses and their common commission by unitary conduct, the identical social harms to which they are directed, and their use by the State in this case to impose double punishment for the killing of a single victim.

**{53}** One final stare decisis concern is the extent to which any prejudice may flow from any justifiable reliance that has been placed on *Gonzales*'s continued application. As we stated in *Swick*, "reliance, which is most important in cases implicating property and contract rights, and least important in cases involving procedural and evidentiary rules, is not present in this case." *Swick*, 2012-NMSC-018, ¶ 18. "The State could not have relied on [*Gonzales*] to its detriment because the double jeopardy prohibition is applied at the conclusion of a case to prevent multiple punishments." *Id.*

15

**{54}** We therefore expressly overrule *State v. Gonzales*, 113 N.M. 221, 824 P.2d 1023 (1992); *State v. Dominguez*, 2005-NMSC-001, 137 N.M. 1, 106 P.3d 563; and *State v. Riley* 2010-NMSC-005, 147 N.M. 557, 226 P.3d 656, and hold that the Double Jeopardy Clause protects Defendant against being punished both for the homicide of Diego Delgado and for causing great bodily harm to Diego Delgado by shooting at a motor vehicle, where both convictions were premised on the unitary act of shooting Diego Delgado. One of the convictions must be vacated.

**D.  The More Severely Punishable Conviction, Shooting at a Motor Vehicle, Should Be Reinstated**

**{55}** As we recently confirmed in *Swick*, 2012-NMSC-018, ¶ 31, New Mexico agrees with the position of other jurisdictions that where one of two otherwise valid convictions must be vacated to avoid violation of double jeopardy protections, we must vacate the conviction carrying the shorter sentence.

**{56}** In this case, we therefore must uphold the conviction for shooting into a motor vehicle and vacate the conviction for voluntary manslaughter. *Compare* § 30-2-3(A) (providing that voluntary manslaughter is a third-degree felony resulting in the death of a human being), *and* NMSA 1978, § 31-18-15(A)(7) (2007) (providing a penalty of six years' imprisonment for a third-degree felony resulting in the death of a human being), *with* § 30-3-8(B) (providing that shooting at a motor vehicle resulting in great bodily harm is a second-degree felony), *and* § 31-18-15(A)(4) (providing a penalty of fifteen years' imprisonment for a second-degree felony resulting in the death of a human being). Whatever one's personal views may be about the more serious of the offenses of manslaughter and causing great bodily harm by shooting into a motor vehicle, principles of separation of powers and of jurisprudential policy demand adherence to the principle we confirmed in *Swick*. As a matter of separation of powers, it is the exclusive prerogative of the Legislature, the law-making branch of our representative democracy, to determine relative seriousness and punishment for criminal offenses. And as a matter of policy, it would be unacceptable for us to hold that where a person's criminal conduct would have violated either of two statutes, a defendant can escape liability for the one carrying the greater punishment by committing the crime in such a manner as to also violate the statute carrying the lesser penalty. Because the Legislature has determined that causing great bodily harm by shooting at a motor vehicle is a higher degree of felony and carries a more severe potential sentence, we reinstate Defendant's conviction for that crime and preclude reinstatement of his conviction for voluntary manslaughter.

**E.  Defendant Was Not Denied His Right to an Impartial Jury**

**{57}** On the first day of trial testimony, Defendant's ex-wife Elizabeth, who had been his girlfriend at the time of the shooting, took the stand. Elizabeth testified that she knew a person on the jury, Ms. Romero, who was best friends with the mother of Elizabeth's current boyfriend. The district judge promptly held a hearing outside the presence of the jury to

16

permit the court and counsel to inquire further into the relationship between Elizabeth and Romero and whether Romero should remain on the jury. Elizabeth testified that Romero's friendship and communications about the case with the mother of her current boyfriend bothered her. She expressed concern that Romero had prejudged Defendant because of his appearance, explaining that after jury selection, Romero had called the boyfriend's mother and told her that Defendant looked "scary."

**{58}** The judge then called Romero in for questioning. Although Romero insisted that she could remain fair and open-minded, the judge agreed with defense counsel that she should be removed from Defendant's jury.

**{59}** Before bringing the remaining jurors back in the courtroom, the judge learned that Romero had made negative comments about Defendant to a potential juror, Ms. Herrera, who had not been selected for Defendant's jury. The judge also questioned Herrera and determined that she had no information that anyone else had heard any of Romero's comments.

**{60}** After Herrera was excused from the courtroom, the judge excused Romero from Defendant's jury, dismissed her from further jury service, and replaced her on Defendant's jury with an alternate juror. The judge brought the jurors back into the courtroom, questioned them to make sure they had not been involved in any discussions of the case with anyone, and reminded them of his admonition not to permit any such discussions to occur.

**{61}** Defendant now argues that he was denied his right to an impartial jury under the United States and New Mexico Constitutions because of Romero's bias and its possible effect on the remainder of the jury.

**{62}** The Sixth Amendment to the United States Constitution guarantees the right to trial by a fair and impartial jury. *See State v. Johnson*, 2010-NMSC-016, ¶ 35, 148 N.M. 50, 229 P.3d 523. "The essence of cases involving juror tampering, misconduct, or bias is whether the circumstance unfairly affected the jury's deliberative process and resulted in an unfair jury." *State v. Mann*, 2002-NMSC-001, ¶ 20, 131 N.M. 459, 39 P.3d 124. A complaining party "must make a preliminary showing that [he or she] has competent evidence that material extraneous to the trial actually reached the jury." *Id.* ¶ 19 (alteration in original) (internal quotation marks and citation omitted).

**{63}** In this case, there was no such showing. To the contrary, the district court took immediate steps to remove the misbehaving juror and ensure that her information had not reached any jurors who would decide Defendant's case. We find no abuse of discretion nor any impairment of Defendant's right to a fair and unbiased jury. *Id.* ¶ 1 (observing that the manner of handling jury misconduct is left to the sound discretion of the trial judge). We thus reject Defendant's claim of error as a result of the events surrounding former juror Romero's activities and communications.

**F.     Defendant Has Not Established Ineffective Assistance of Counsel**

**{64}**     Defendant claims he was denied effective assistance of counsel because his attorney (1) failed to object to the flawed felony murder jury instructions, (2) failed to request a mistrial due to the allegedly biased juror, and (3) may have been ineffective as a result of counsel's suspected cocaine use.  We have granted full relief on the merits of the jury instruction issue as a matter of fundamental error and have also determined that there was no error in the district court's resolution of the potential juror bias issue.  The record before us is insufficient for us to address on direct appeal whether there is any merit in Defendant's remaining ineffective assistance claim.  *See State v. Arrendondo*, 2012-NMSC-013, ¶ 44, 278 P.3d 517 (declining to review an ineffective assistance claim on direct appeal, without prejudice to a defendant's right to make an adequate record and seek relief in the context of a postconviction habeas corpus proceeding).

**III.     CONCLUSION**

**{65}**     We vacate Defendant's conviction for felony murder of Diego Delgado and hold that he cannot be again placed in jeopardy for that offense.  We reinstate Defendant's previously vacated conviction for shooting at a motor vehicle and causing great bodily harm to Mr. Delgado.  Because it would constitute double jeopardy to use the same shooting of the same victim to also punish Defendant for homicide, we hold that the manslaughter conviction, the offense with the lesser penalty, cannot be reinstated.  We reject Defendant's remaining claims of error and remand to the district court for entry of an amended judgment and sentence in conformity with this Opinion.

**{66}     IT IS SO ORDERED.**

_____
                                        **CHARLES W. DANIELS, Justice**


**WE CONCUR:**

_____
**PETRA JIMENEZ MAES, Chief Justice**

_____
**RICHARD C. BOSSON, Justice**

_____
**EDWARD L. CHÁVEZ, Justice**

_____
**BARBARA J. VIGIL, Justice**

**Topic Index for *State v. Montoya*, No. 32,279**

**APPEAL AND ERROR**
Fundamental Error
Remand
Standard of Review

**ATTORNEYS**
Effective Assistance of Counsel

**CONSTITUTIONAL LAW**
Double Jeopardy

**CRIMINAL LAW**
Felony Murder
Homicide
Provocation
Shooting Offences
Voluntary Manslaughter

**CRIMINAL PROCEDURE**
Acquittal
Double Jeopardy
New Trial
Sentencing
Stare Decisis

**JURIES**
Communication with Court
Impartial Jury
Improper Juror Communication

**JURY INSTRUCTIONS**
Criminal Jury Instructions

**STATUTES**
Interpretation
Legislative Intent