This memorandum opinion was not selected for publication in the New Mexico Appellate Reports. Please see Rule 12-405 NMRA for restrictions on the citation of unpublished memorandum opinions. Please also note that this electronic memorandum opinion may contain computer-generated errors or other deviations from the official paper version filed by the Court of Appeals and does not include the filing date.

# IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

**STATE OF NEW MEXICO**,

    Plaintiff-Appellee,

**v.**                                                   **NO. 31, 174**

**HENRY HERNANDEZ,**

    Defendant-Appellant.

**APPEAL FROM THE DISTRICT COURT OF EDDY COUNTY**
**Thomas A. Rutledge, Judge**

Gary K. King, Attorney General
Margaret McLean, Assistant Attorney General
Santa Fe, NM

for Appellee

Bennett J. Baur, Chief Public Defender
Eleanor Brogan, Assistant Appellate Defender
Santa Fe, NM

for Appellant

## MEMORANDUM OPINION

**HANISEE, Judge.**

{1}     Henry Hernandez (Defendant) appeals his convictions for aggravated battery on a household member and the first degree kidnapping of Hilda Huerta (Victim), Defendant's then-girlfriend. Defendant argues that (1) the district court abused its discretion by admitting prejudicial evidence related to severed counts, (2) the State committed misconduct by obtaining admission of this same evidence in violation of the severance order, (3) evidence of Defendant's bad acts was impermissibly admitted at trial, (4) there was insufficient evidence to support Defendant's convictions, (5) his convictions violate double jeopardy, and (6) there was cumulative error. We affirm.

**I.     BACKGROUND**

{2}     Victim testified to the following series of events. On November 2, 2008, Defendant, his brother Robert Hernandez, and Victim used methamphetamine together at Defendant's home. Defendant thereafter began exhibiting paranoid behavior, declared that someone was after him, and armed himself with a baseball bat. Robert left the house to go out with a friend, James Carrillo. Around 6:30 a.m. the following morning, Robert and Carrillo returned to Defendant's home and fell asleep on couches in Defendant's living room. When Defendant observed the two men sleeping in his living room, he informed Victim that Carrillo was the person that had tried to kill him the previous night. Defendant then walked into the living room, assumed a batter's

stance, swung, and hit Carrillo in the forehead with the baseball bat. Robert awoke and sought to explain, to no avail, that Carrillo was present with him. Defendant hit Carrillo again in the forehead with the bat, and Carrillo's forehead began to bleed.

{3} Defendant yelled to Victim to clean up the blood, which Victim wiped away from Carrillo's face and the sofa upon which he had slept and was struck. While doing this, Victim overheard Defendant say to Robert, "well, should I get rid of her too?" Victim maintained that she understood Defendant to have referred to her when he made this comment. Robert then drove Carrillo home. When he returned ten minutes later, Robert suggested that he, Victim, and Defendant drive to Victim's apartment. Once there, Victim prepared breakfast burritos, and Defendant threw several baseball bats that he had gathered from his home into a dumpster outside of the apartment.

{4} Within minutes, several police officers stopped by pursuant to their investigation of the assault perpetrated upon Carrillo. The officers initially spoke with Defendant and Robert, and then asked Victim whether she lived in the apartment and how she was doing since they were aware Carrillo was her friend. Victim testified that she did not talk to the police about what she had witnessed because she was never alone to do so; Defendant actively remained in her immediate proximity while the police were at her apartment.

{5}     Eventually, Robert, Defendant, and Victim drove to Victim's cousin's tire shop to obtain lugnuts for their vehicle. Victim testified that she did not tell her cousin what had happened that day because Defendant was constantly by her side. The three left the tire shop and drove toward Defendant's house, but as previously feared, their car became immobilized due to a failure associated with its wheels. Defendant and Robert's request, Victim walked alone through nearby fields to Defendant's aunt's home, located approximately one mile from the broken-down vehicle, to obtain a tool to fix the wheels. When queried why she did not avail herself of the opportunity for freedom presented by this task, Victim stated that she feared that Defendant and Robert would hurt her son if she fled. Nor did she tell their aunt about Defendant, Carrillo, and the baseball bat for the same reason and based upon her concern regarding the familial relationships between the aunt and her nephews. In any event, the aunt did drive Victim back to the broken-down car, which the brothers succeeded in restoring to mobility.

{6}     At about 9:00 p.m. that same evening, Defendant, Robert, and Victim returned to Defendant's house, from which Robert quickly departed, and Defendant and Victim went to bed together. Early the next morning, Defendant awoke, turned on the air conditioner, pulled the sheet off Victim's naked body, and told her that he was going to tie her up. While Victim was still unclothed on the bed, he hog-tied her with

4

speaker wire, binding her hands and feet together in front of her torso. When Victim screamed loudly and struggled with him, Defendant inserted a small towel in her mouth. Defendant removed the towel just before Victim lost consciousness, and then pushed her off the bed while she was still tied up. Victim landed on her side and Defendant stepped on her head and face. While she was still tied up, he punched her twice in the face, knocking out one of her teeth. Defendant then covered Victim with a sheet, and informed her that if he had a car, he would drive her out to the country in order to bury her alive. He effectuated a "head lock" upon Victim until she lost consciousness.

{7}     When Victim awoke on the floor of Defendant's bedroom, Defendant utilized a pair of pliers to squeeze her nipples and forcibly remove her earrings. He then placed the sheet over Victim's head and carried her to what she surmised was the living room, placing her on a desk's edge while she was still hog-tied. He then told her that if she moved, she would fall to the ground. At that point in time, Victim heard water running. Defendant announced to Victim, "well, I guess I'll just drown you," and proceeded to transport her into the bathroom where he dunked her head under water twice. Defendant finally untied Victim and directed her to take a shower. Afterward, Defendant washed his clothes in the tub, and he and Victim got dressed and hung Defendant's wet garments on the clothesline outside. Defendant remained

5

constantly by Victim's side the remainder of the day.

{8} The next day, both went outside to retrieve Defendant's dried clothing. When Defendant momentarily strayed from Victim toward the back of his yard, she noticed that the gate was open and she dashed through it. Defendant gave chase, yet Victim was able to reach a neighbor's yard, where she screamed for help and implored the neighbor to call the police. Defendant caught up with Victim and tried to pull her away from a fence onto which she clung. Victim again escaped and dashed into the street and in front of a pickup truck, which was able to swiftly halt. Victim asked the truck's occupants to call police, and pleaded with them to prevent Defendant from hauling her away. When Defendant caught up, he asserted that Victim was on drugs and that he needed to take her home.

{9} When the police arrived, Victim told the officers that she did not want to go with Defendant because she was scared of him. Defendant told the officers that Victim was on drugs and that he wanted to take her home in order to care for her. Victim denied being on drugs, but she did not tell the officers about Defendant's actions because she continued to be afraid of Defendant. Victim went with the officers to Defendant's house to retrieve her belongings. The officers then drove Victim back to her own apartment. Although she did not report the abuse to those officers, seven days later Victim told her cousin, Lieutenant Guy Chavarria of the

6

Artesia Police Department, about Defendant's behavior during the course of the preceding days. Lieutenant Chavarria put Victim in contact with Detective Miguel (Mike) Garcia of the Eddy County Sheriff's Office, to whom she also described the series of events that transpired on November 3, 4, and 5. As a result of Defendant's actions, Victim incurred injuries to her lips, face, wrists, and feet; lost a tooth; and experienced an absence of feeling in her arms and legs.

{10}     Defendant was charged with kidnapping in the first degree (count one), aggravated battery against a household member (count two), aggravated battery with a deadly weapon (count three), and tampering with evidence (count four). Counts one and two pertained to offenses committed against Victim. Counts three and four dealt with the crimes Defendant committed against Carrillo. Prior to trial, Defendant moved for severance of these charges, arguing that counts one and two were not of the same or similar character, or part of the same conduct or series of acts as the latter counts. *See* Rule 5-203(A) NMRA (stating grounds for joinder of offenses). Defendant also requested that the court limit the State's evidence concerning the crimes against Carrillo, but conceded that some evidence of those crimes was admissible to prove motive. The court granted Defendant's motion, ordering separate trials for counts one and two from counts three and four. With regard to evidentiary issues, the court directed that:

7

[T]he State's inquiry into the details of the case involving . . . Carrillo shall be limited to questions to establish what [Victim] saw Defendant do to . . . Carrillo, what Defendant told [Victim] to do afterward, and the reasonableness of her compliance with . . . Defendant's commands given what she had witnessed. Unless the defense opens the door on cross examination or in its case in chief, there shall be no graphic inquiry into or testimony about the nature or extent of . . . Carrillo's injuries and the use of photographs or medical reports of such injuries shall not be permitted.

{11}    At the trial on counts one and two, Victim provided the testimony set forth above. When Victim began to describe how Defendant assumed a batter's stance and hit Carrillo in the forehead, causing Carrillo's forehead to bleed profusely, Defendant objected to the State's line of questioning. Defendant argued that this level of detail concerning the crime against Carrillo violated the district court's severance order. The court overruled the objection.

{12}    When Victim testified that Defendant threw his baseball bats in the dumpster while she cooked burritos, Defendant objected again, arguing that the testimony violated the court's severance order. That objection too was overruled. Victim went on to state that Defendant told her that he threw the bats into the dumpster. Defendant then moved for a mistrial, arguing that the State and its witness were in perpetual violation of the severance order. The motion was denied.

{13}    At trial, Carrillo also testified regarding the incident when Defendant hit him twice in the forehead with the bat. When the State asked Carrillo what his injuries

looked like before he went to the hospital, Defendant objected and argued that such a question violated the purpose of the severance order. The district court overruled the objection. Carrillo subsequently testified that he suffered injuries to his eye and forehead, to the length of his ensuing hospital stay, and about whether Robert visited him in the hospital. Defendant also objected to the State's questioning of a police officer regarding Defendant's disposal of items in the dumpster.

**{14}** The jury found Defendant guilty of first degree kidnapping of Victim and aggravated battery on a household member. Immediately following the trial on counts one and two, Defendant pleaded guilty to counts three and four. Defendant appeals his convictions for counts one and two.

## II. DISCUSSION

### A. The District Court Did Not Abuse Its Discretion by Admitting Evidence Related to the Severed Case and Evidence of Defendant's Prior Bad Acts

**{15}** Although Defendant couches this issue as the district court's failure to fully sever counts one and two from counts three and four, his legal challenge is to the admission of evidence regarding the latter severed charges at Defendant's trial for counts one and two. Defendant argues that the district court abused its discretion by admitting unfairly prejudicial evidence related to the crimes alleged in severed counts three and four. Defendant also asserts the State committed misconduct in seeking to admit that same evidence. Defendant additionally contends that the district court

9

violated his due process rights by admitting evidence indicating that he made prior threats against Victim's life.

{16} "We review the admission of evidence under an abuse of discretion standard and will not reverse in the absence of a clear abuse." *State v. Sarracino*, 1998-NMSC-022, ¶ 20, 125 N.M. 511, 964 P.2d 72. We review preserved issues of prosecutorial misconduct "under the deferential abuse of discretion standard because the trial court is in the best position to evaluate the significance of any alleged prosecutorial errors." *State v. Trujillo*, 2002-NMSC-005, ¶ 49, 131 N.M. 709, 42 P.3d 814 (internal quotation marks and citation omitted). "An abuse of discretion occurs when the ruling is clearly against the logic and effect of the facts and circumstances of the case. We cannot say the trial court abused its discretion by its ruling unless we can characterize it as clearly untenable or not justified by reason." *State v. Otto*, 2007-NMSC-012, ¶ 9, 141 N.M. 443, 157 P.3d 8 (internal quotation marks and citation omitted).

{17} Generally, "[e]vidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Rule 11-404(B)(1) NMRA. Nonetheless, "[t]his evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Rule 11-404(B)(2). "This list is not exhaustive and evidence of other wrongs may be

admissible on alternative relevant bases so long as it is not admitted to prove conformity with character." *Otto*, 2007-NMSC-012, ¶ 10 (internal quotation marks and citation omitted).

**{18}** To admit evidence under Rule 11-404(B), counsel must "identify the consequential fact to which the proffered evidence of other acts is directed. The proponent of the evidence must demonstrate its relevancy to the consequential facts, and the material issue, such as intent, must in fact be in dispute." *State v. Serna*, 2013-NMSC-033, ¶ 17, ___ P.3d ___ (internal quotation marks and citations omitted). After the proponent shows "that evidence of other acts has a legitimate alternative use that does not depend upon an inference of propensity, the proponent must establish that under Rule 11-403 NMRA, the probative value of the evidence used for a legitimate, non-propensity purpose outweighs any unfair prejudice to the defendant." *State v. Kerby*, 2005-NMCA-106, ¶ 25, 138 N.M. 232, 118 P.3d 740, *aff'd*, 2007-NMSC-014, ¶ 25, 141 N.M. 413, 156 P.3d 704. With regard to "evidence of other uncharged bad acts, unfair prejudice refers to the risk that the jury, notwithstanding limiting instructions, *see* Rule 11-105 NMRA, nevertheless will draw unfavorable inferences about the defendant's propensity for criminal conduct from evidence of non-charged bad acts[.]" *Kerby*, 2005-NMCA-106, ¶ 25

**{19}** "The fact that competent evidence may tend to prejudice [the] defendant is not

11

grounds for exclusion of that evidence. The question is whether the probative value of the evidence was outweighed by its prejudicial effect." *State v. Hogervorst*, 1977-NMCA-057, ¶ 46, 90 N.M. 580, 566 P.2d 828 (citation omitted). In reviewing whether the district court abused its discretion in evaluating whether "the prejudicial impact of evidence outweighs its probative value[,] . . . . the appellate court considers the probative value of the evidence, [and notes that] the fact that some jurors might find this evidence offensive or inflammatory does not necessarily require its exclusion[.]" *State v. Rojo*, 1999-NMSC-001, ¶ 48, 126 N.M. 438, 971 P.2d 829 (internal quotation marks and citations omitted).

**1.     Evidence Related to the Severed Case Was Properly Admitted**

{20}    Over Defendant's objection, the district court allowed the State to question Victim about how Defendant hit Carrillo and about Defendant's ensuing disposal of baseball bats in the dumpster; to question Carrillo about his injuries, length of hospital stay, and whether Robert visited him in the hospital; and to question a police officer about witnessing Defendant dispose of items in a dumpster outside of Victim's apartment. Prior to trial, the State explained that Defendant's crimes against both Carrillo and Victim were part of an interlinked series of acts which supplied the incentive for Defendant's crimes against Victim. Thus, the State argued that the evidence regarding Defendant's crimes against Carrillo was admissible under Rule 11-

12

404(B) to show Defendant's motive of preventing Victim "from reporting what she had observed." Additionally, the State argued that the crux of Defendant's theory of the case was that Victim's testimony was a fabrication and that the evidence related to counts three and four countered this assertion by corroborating Victim's testimony.

{21}    As mentioned, the court had previously authorized the admission of evidence that established what Victim "saw Defendant do to Mr. Carrillo, what Defendant told [Victim] to do afterward, and the reasonableness of her compliance with . . . Defendant's commands given what she had witnessed." When Defendant objected at trial to the State's questions, the State reasserted that its objective was to establish Defendant's motive, demonstrate the reasonableness of Victim's fear, and support Victim's challenged credibility.

{22}    We agree that the evidence regarding Defendant's battery of Carrillo and disposal of the bats was probative of Defendant's motive, and the reasonableness of Victim's fear of Defendant and compliance with his commands during the three-day ordeal. Prior to trial, Defendant raised an alibi defense, claiming that he was elsewhere at the time and place the crimes occurred. Defendant's entire defense thus rested on the theory that Victim had fabricated the story of Carrillo's baseball bat beating, as well as Victim's own kidnapping and torture. Thus, the contested evidence was responsive to Defendant's theory of the case: the Victim's credibility. Victim's

13

testimony about Defendant's sudden assault on Carrillo and his subsequent removal and disposal of evidence demonstrated Defendant's intent to cover up his crime and explained the basis for her fear of Defendant, who had in the immediate aftermath of his assault on Carrillo proposed to "get rid" of her as well. Likewise, Carrillo's testimony about his injuries and the police officer's testimony about the dumpster supported Victim's testimony and lent credibility to the testimony of Victim which Defendant chose to assail. In sum, the evidence offered jurors an explanation as to why Victim did not escape from Defendant's presence sooner and that Victim's fear of Defendant was rational, points Defendant chose to highlight at trial both during his cross examination of Victim and in his closing argument.

{23} We also agree that the probative value of this evidence was not outweighed by the prejudice it may have caused Defendant. "Unfair prejudice does not mean the damage to a defendant's case that results from the legitimate probative force of the evidence; rather it refers to evidence that tends to suggest decision on an improper basis." *State v. Anderson*, 1994-NMSC-089, ¶ 63, 118 N.M. 284, 881 P.2d 29. This evidence presented a picture of events inconsistent with Defendant's alibi and theory of the case. Nonetheless, it did not do so unfairly. Had not Defendant challenged Victim's credibility or sought to undermine her assertion of fear, the probative component of the evidence admitted would have been greatly reduced.

14

{24}    To the extent that Defendant contends Victim's statement that blood "gushed" from the wounds inflicted on Carrillo's forehead was unfairly prejudicial, we again disagree. This level of detail was appropriate to convey the sudden and violent circumstances under which Victim maintained she became fearful of Defendant. Indeed, a reasonable jury could remain safely within its fact-finding autonomy, not to mention its employment of common sense, to have anticipated the likelihood of profuse bleeding following the two-time purposeful collision between a baseball bat and a sleeping man's head. *See* UJI 14-5060 NMRA (instructing jurors to employ "reason and common sense" in their determination of guilt beyond a reasonable doubt). Moreover, Defendant was on notice that Victim would likely go into this level of detail to show her fear was reasonable. Prior to trial, the district court made it clear that although photographic evidence would be inadmissable, Victim would likely explain that she witnessed "a brutal attack, with a baseball bat, blood all over the place. She couldn't tell whether he was dead or alive—he was so badly beaten. And then she was ordered to clean it up and she fe[lt] like she [wa]s constrained."

{25}    We reject Defendant's argument that the State engaged in prosecutorial misconduct when it introduced evidence related to the severed case. First and foremost, we have already decided that it was not error to admit such evidence as its probative value was not outweighed by the prejudice it may have caused Defendant,

15

which we determine not to be unfair in nature. In addition, the court's evidentiary ruling associated with its order of severance expressly allowed the State to elicit testimony regarding Defendant's actions that showed why Victim's fear and inaction were reasonable. That is precisely what the State did here. In sum, we conclude that the State did not engage in misconduct through its questioning of Victim, Carrillo, and the police officer in relation to facts associated with the severed case.

**2.     Evidence of Defendant's Prior Threats Toward Victim Was Properly Admitted**

**{26}**     Defendant contends that his right to due process was violated when the court allowed Victim to testify to Defendant's uncharged prior threats toward Victim. The district court admitted the evidence on redirect following defense counsel's vigorous and extensive cross examination which the district court determined to purposefully call into question the reasonableness of Victim's fear and her inaction during the three-day ordeal with Defendant. Despite Defendant's due process objection, the district court concluded that "this door has been opened" and permitted the State to introduce the evidence to "establish that there was more than just this isolated occurrence to justify the [Victim's] fear and failure to initiate action."

**{27}**     Pursuant to this ruling, Victim testified to a prior incident where she wanted to leave Defendant's home against Defendant's wishes. During the incident, Defendant forced Victim to sit in a chair while he poured kerosene on her head and subsequently

16

tossed a lit match toward her. Defendant also threatened Victim with a knife, assuring her she would be slain should she try to leave. Victim additionally testified about another incident where Defendant refused to allow her to go to work. With regard to these topics of testimony, the court provided a limiting instruction to the jury, stating: "The [c]ourt allowed [Victim] to be questioned about contacts with Defendant prior to the first part of November, 2008. This testimony was given only for the limited purpose of your determining the reasonableness of [Victim]'s alleged fear during the first part of November 2008, and for no other purpose."

{28}    On appeal, Defendant argues that "[o]nce the jury heard bad act evidence that [Defendant] had poured kerosene on [Victim] and threw a lit match on her and threatened to kill her with a knife, it was a foregone conclusion that the jury would convict him of the crimes charged in the present case." Defendant asserts that admission of the evidence of uncharged prior threats was fundamentally unfair and violated his right to due process.

{29}    The admission of uncharged acts evidence, generally permissible only pursuant to Rule 11-404, may also gain admissibility based on the defense employed by a defendant and the content of cross examination designed to suggest a witness's testimony is a product of bias. In *State v. Abril*, 2003-NMCA-111, ¶ 10, 134 N.M. 326, 76 P.3d 644, *overruled on other grounds by State v. Torres*, 2012-NMCA-026,

17

¶ 38, 272 P.3d 689, we held that, when accompanied by a properly requested limiting instruction in accordance with Rule 11-105, "evidence of [the d]efendant's character and prior acts was admissible to rebut the inference of bias raised by [the d]efendant's questioning of [the state's witness] regarding her negative feelings toward [the d]efendant, even though this evidence may have been inadmissible for other purposes under Rule 11-404." Notably, Rule 11-105 requires that "[i]f the court admits evidence that is admissible against a party or for a purpose—but not against another party or for another purpose—the court, on timely request, must restrict the evidence to its proper scope and instruct the jury accordingly."

{30}     Like the Court in *Abril*, we too conclude that evidence of Defendant's prior bad acts was admissible to rebut the inference of bias raised by the defense's line of questioning. Defendant's theory of the case was that Victim contrived the kidnapping and batteries. During cross examination, defense counsel stressed the fact that Victim stayed with Defendant after his attack on Carrillo and waited one week to alert anyone about Defendant's actions. Indeed, Defendant dissected every perceived opportunity Victim may have had for escape or to obtain help. For example, Defendant asked Victim: "You were right by the sheriff's office, and you didn't try running to the sheriff's office and calling for help?" And, after establishing that Victim had spoken with her cousin at the tire shop after Victim witnessed Defendant assault Carrillo,

18

Defendant asked:

> Defense Counsel: You said you know your cousin pretty well?
>
> Victim: Yes I do.
>
> Defense Counsel: And you are kind of close to him?
>
> Victim: Yes sir.
>
> Defense Counsel: But you didn't say anything to him at that time?
>
> Victim: No I didn't.
>
> Defense Counsel: You didn't try to give him some kind of eye signal or something?
>
> Victim: No I didn't . . .

Defendant also questioned the level of Victim's fear by pointing out that she did not try to escape even though she was alone as she walked to Defendant's aunt's home. Defense counsel asked, "Did you make any attempt to flag somebody down on your way over there? . . . Did you make an attempt to go to any other houses [near the aunt's home] and get help? . . . And when you got to [the aunt's house], you didn't say anything to her either, right?" Defendant also pointed out that Victim did not disclose the kidnapping and battery to the officers who arrived after she escaped from Defendant's home.

{31} As in the context of the evidence that we determined was properly admitted with regard to the severed counts, evidence of Defendant's threats was both

19

prejudicial yet probative of why Victim did not try to escape or seek police assistance sooner. In *State v. Aguayo*, 1992-NMCA-044, ¶ 25, 114 N.M. 124, 835 P.2d 840, we recognized the "damning species of evidence" that uncharged misconduct can be and stating that evidence of prior bad acts "should not be received when very probably its *sole* result, or at least its overwhelming result, will be that of establishing [the] defendant's bad character, or his disposition or propensity to commit crime, as the basis for an inference that he committed the crime with which he is charged and for which he is being tried." *Id.* ¶ 26 (emphasis added) (internal quotation marks and citation omitted). Unlike *Aguayo*, the purpose of Victim's testimony was to explain her fear of Defendant. This rationale supports the trial court's exercise of its discretion to allow the evidence despite its simultaneously prejudicial character. As we explained above with regard to the evidence related to counts three and four, the State would not have needed this evidence for its case had not Defendant elected to attack the rationality of Victim's fear and inaction. Since Defendant opened the door to such inquiries, we do not consider the testimony more unfairly prejudicial than probative.

{32} Also, in accordance with Rule 11-105, the district court issued a limiting instruction regarding this bad-act evidence upon Defendant's request. The instruction appropriately limited the evidence to its intended purpose: for the jury to determine

20

the reasonableness of Victim's fear. It is well-established under New Mexico case law that juries are presumed to follow the court's instructions. *Otto*, 2007-NMSC-012, ¶ 17; *State v. Gonzales*, 1992-NMSC-003, ¶ 35, 113 N.M. 221, 824 P.2d 1023 ("The jury is presumed to follow the court's [limiting] instructions.") *overruled on other grounds by State v. Montoya*, 2013-NMSC-020, ¶ 2, ___P.3d___.

{33}     Because this evidence was relevant, responsive to defense counsel's effort to establish bias, not unfairly prejudicial under Rule 11-403, and its use was restricted by the district court, Defendant's due process rights were not violated.

**B.     Sufficient Evidence Supports Defendant's Convictions**

{34}     Defendant maintains that there is insufficient evidence to support his convictions for kidnapping and aggravated battery on a household member. "The test for sufficiency of the evidence is whether substantial evidence of either a direct or circumstantial nature exists to support a verdict of guilty beyond a reasonable doubt with respect to every element essential to a conviction." *State v. Riley*, 2010-NMSC-005, ¶ 12, 147 N.M. 557, 226 P.3d 656 (internal quotation marks and citation omitted) *overruled on other grounds by Montoya*, 2013-NMSC-020. We view the evidence "in the light most favorable to the guilty verdict, indulging all reasonable inferences and resolving all conflicts in the evidence in favor of the verdict." *State v. Cunningham*, 2000-NMSC-009, ¶ 26, 128 N.M. 711, 998 P.2d 176. "Because an appellate tribunal

does not enjoy the same exposure to the evidence and witnesses as the jury at trial, our review for sufficiency of the evidence is deferential to the jury's findings." *State v. Garcia*, 2011-NMSC-003, ¶ 5, 149 N.M. 185, 246 P.3d 1057.

**1.    Sufficient Evidence Supports Defendant's Aggravated Battery Conviction**

{35}    With regard to his conviction for aggravated battery against a household member, Defendant argues that the State failed to prove the third element of the offense: That Defendant "caused great bodily harm to [Victim] *or* acted in a way that would likely result in death or great bodily harm to [Victim]." Because this element presents us with alternative bases for guilt, we note that "due process does not require a general verdict of guilt to be set aside so long as *one of the two* alternative bases for conviction is supported by sufficient evidence." *State v. Salazar*, 1997-NMSC-044, ¶ 43, 123 N.M. 778, 945 P.2d 996.

{36}    Here, the State produced sufficient evidence to show that Defendant acted in a way that would likely result in death or great bodily harm to Victim. In particular, Victim's testimony indicates that Defendant prevented Victim from breathing several times. Defendant first placed a towel in Victim's mouth while she was hog-tied, nearly causing her to lose consciousness from lack of oxygen. Defendant then placed Victim in a headlock, cutting off her air supply to the extent that she blacked out. Defendant also attempted to drown Victim multiple times, holding her head under

water in the bath tub. Each act of suffocation could have resulted in her death or brain damage. As such, we conclude that Victim's testimony about her suffocation provided the jury with substantial evidence to convict Defendant beyond a reasonable doubt with regard to the third element of aggravated battery against a household member.

**2.      Sufficient Evidence Supports Defendant's Kidnapping Conviction**

{37}      Defendant asserts that he "presented an alternate and credible version of the events that [Victim] fabricated her allegations that [Defendant] beat and kidnapped her. Even though the jury was not required to accept his version of events, his defense should not simply be disregarded by this Court." We conclude otherwise. Based on the recitation of testimony discussed above in this opinion, sufficient evidence exists in the record to prove that Defendant unlawfully restrained or confined Victim by force or intimidation with the intent to inflict death or physical injury on Victim. *See* NMSA 1978, § 30-4-1 (2003) (stating the elements of kidnapping). It is for the finder of fact, not an appellate court, to reconcile any conflicts in the evidence and determine where the truth lies. The fact finder can choose to disregard Defendant's version of events. *State v. Cabezuela*, 2011-NMSC-041, ¶ 45, 150 N.M. 654, 265 P.3d 705. Since this Court reviews the evidence in the light most favorable to the verdict, *State v. Barber*, 2003-NMCA-053, ¶ 16, 133 N.M. 540, 65 P.3d 1095, *aff'd*, 2004-NMSC-

019, 135 N.M. 621, 92 P.3d 633, we affirm with respect to sufficiency for Defendant's kidnapping conviction.

**C.     Defendant's Convictions for Kidnapping and Aggravated Battery on a Household Member Do Not Violate Double Jeopardy**

**{38}**     Defendant lastly argues that his convictions for kidnapping and aggravated battery on a household member violate double jeopardy, contending that his convictions under the two statutes constitute the same offense.  We review constitutional questions of law, like this claim of double jeopardy, de novo.  *State v. Montoya*, 2013-NMSC-020, ¶ 22, ___P.3d___ ; *State v. Quick*, 2009-NMSC-015, ¶ 6, 146 N.M. 80, 206 P.3d 985.  We analyze Defendant's double-description double jeopardy claim in accordance with the two-part test set forth in *Swafford v. State*, 1991-NMSC-043, ¶¶ 27-34, 112 N.M. 3, 810 P.2d 1223.  Under *Swafford*, we first analyze, "whether the conduct underlying the offenses is unitary, i.e., whether the same conduct violates both statutes, and, if so, [we then] proceed[] to analyze whether the [L]egislature intended to create separately punishable offenses."  *State v. Gutierrez*, 2012-NMCA-095,¶ 8, 286 P.3d 608 (internal quotation marks and citation omitted) *cert. denied*, 2012-NMCERT-008, 296 P.3d 490.

**{39}**     Even assuming that Defendant's conduct was unitary in this case, we conclude that the Legislature intended to treat kidnapping and aggravated battery against a household member as two separately punishable offenses.  The first step in

24

determining legislative intent is to apply the *Blockburger* test, and assess "in the abstract whether each statutory offense requires proof of a fact which the other does not." *Montoya*, 2013-NMSC-020, ¶ 31 (internal quotation marks and citations omitted); *see Blockburger v. United States*, 284 U.S. 299, 304, (1932) (stating the *Blockburger* test). When the elements are the same, we infer that the Legislative did not intend the offenses to be separately punishable. But if neither statute "is definitionally subsumed within the other," this court then engages in "a substantive sameness analysis." *Montoya*, 2013-NMSC-020, ¶¶ 32, 46.

{40} To do so, we utilize "traditional means of determining legislative intent: the language, history, and subject of the statutes, and we must identify the particular evil sought to be addressed by each offense." *Id.* ¶ 32 (internal quotation marks and citation omitted). We take "into consideration the relationship between the statutory offenses and their common commission by unitary conduct, the . . . social harms to which they are directed, and their use by the State in this case." *Id.* ¶ 52. Typically, if the two statutes are "usually violated together, [and] seem designed to protect the same social interest, the inference becomes strong that the function of the multiple statutes is only to allow alternative means of prosecution." *Id.* ¶ 32. Furthermore, "lenity applies in cases of ambiguity regarding the reach of criminal statutes, because reasonable minds can differ as to the Legislature's intent in punishing the two crimes."

*Id.* ¶ 51 (alteration, internal quotation marks, and citation omitted).

{41} We applied these principles recently in *Gutierrez*, 2012-NMCA-095. In that case, we concluded that robbery and aggravated battery against a household member were intended by the Legislature to be separately punishable offenses. We stated that the crime of battery against a household member requires proof of an additional element that is extraneous to the elements of robbery: proof that the victim have a continuing personal relationship with the assailant. *Id.* ¶ 12. And, "[t]he crime of robbery likewise contains an element extraneous to the battery: the theft of anything of value." *Id.* (internal quotation marks and citation omitted).

{42} We further explained that robbery and battery against a household member address "distinct deviant social conduct, even when simultaneously committed." *Id.* ¶ 20. Robbery primarily addresses takings of property by force, whereas aggravated battery on a household member addresses impermissible applications of force against a specific group of people: household members. *Id.* This Court concluded that "[t]he distinct policy directives and subject matter of robbery and battery against a household member, and their rare occurrence together, persuade us that the [L]egislature intended these crimes to be punished separately, even when they occur as part of the same criminal transaction." *Id.* ¶ 18.

{43} Likewise, the statutes for kidnapping and aggravated battery against a

26

household member each have elements not found in the other. Kidnapping requires "the unlawful taking, restraining, transporting or confining of a person." Section 30-4-1(A). Whereas, aggravated battery on a household member requires the State to prove the battery was committed against "a person with whom a person has had a continuing . . . dating or intimate relationship." NMSA 1978, § 30-3-11 (2010).

{44}    Furthermore, the two crimes are not substantively alike. The evils sought to be addressed by each offense differ substantially. As we explained in *Gutierrez*, 2012-NMCA-095, ¶ 20, "battery against a household member . . . specifically protects against the use of . . . force when it is directed at a certain group of people—household members. Thus, the legislative purpose of criminalizing battery against a household member applies to a narrower class of persons than either aggravated or simple battery." Dissimilarly, the offense of kidnapping seeks to address unlawful restrictions on any victim's physical liberty. The crime of kidnapping does not seek to protect a particular class of victims. In sum, the statutes do not work together toward extinguishing the same societal harms.

{45}    The statutory scheme for kidnapping further supports our conclusion that the statutes permit multiple punishments for kidnapping and aggravated battery against a household member. The kidnapping statute states that, when a defendant "commits kidnapping[, he] is guilty of a first degree felony, except that he is guilty of a second

degree felony when he voluntarily frees the victim in a safe place and does not inflict physical injury or a sexual offense upon the victim." Section 30-4-1. As the State observes, a defendant who fails to release Victim in a safe place will have committed a first degree felony regardless of whether or not he inflicted injury or a sexual offense during the kidnapping. To conclude that the State could not seek separate punishments for both kidnapping and the aggravated battery committed during it would markedly diminish legislative protections for kidnapping victims, who in addition to having their liberty wrongfully taken, face a panoply of potential additional criminal wrongs.

{46} Lastly, these two offenses are not typically committed with unitary conduct. Aggravated battery against a household member has no inherent association with kidnapping. As explained above, the latter attempts to protect a specific class of victims from harm, whereas the other targets restraints on liberty of people generally. And there is no evidence that these two crimes are usually committed together. Aggravated battery against a household member does not characteristically involve "the unlawful taking, restraining, transporting or confining of a person." Section 30-4-1(A). The fact that the person is a household member does not make it more likely that they will be kidnapped.

{47} As such, we conclude that these statutes address two different evils, are not

28

commonly commissioned by unitary conduct, and do not protect the same social interest. Defendant's convictions for aggravated battery against a household member and kidnapping are substantively divergent and do not violate double jeopardy.

**D.      Defendant Was Not Deprived of a Fair Trial**

{48}      Lastly, Defendant contends that cumulative error deprived him of a fair trial. As we have concluded that there was no error, we disagree and affirm Defendant's conviction.

**III.      CONCLUSION**

{49}      For the reasons stated above, we affirm.

{50}      **IT IS SO ORDERED.**


_____
**J. MILES HANISEE, Judge**

**WE CONCUR:**



_____
**MICHAEL D. BUSTAMANTE, Judge**




_____
**MICHAEL E. VIGIL, Judge**